**MILFORD POWER LIMITED PARTNERSHIP, by its general partner MILFORD POWER ASSOCIATES, INC., Plaintiff and Defendant-in-Counterclaim,**

v.

**NEW ENGLAND POWER COMPANY, Defendant and Plaintiff-in-Counterclaim,**

v.

**ENRON CORP., Enron Power Marketing, Inc., Jones Capital Corp., and Jones Medway, Inc., Additional Defendants-in-Counterclaim.**

Civil Action No. 94–40180–NMG.

United States District Court,
D. Massachusetts.

March 14, 1996.

R. Robert Popeo, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Milford Power Ltd.

Michael P. Angelini, Vincent F. O'Rourke, Jr., Barry A. Bachrach, Mark W. Powers, Bowditch & Dewey, Worcester, MA, for New England Power Company.

Michael P. Angelini, Bowditch & Dewey, Worcester, MA, for New England Power Co.

R. Robert Popeo, Paul D. Wilson, Alan S. Gale, Joseph P. Messina, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Enron Corp., Jones Capital Corp.

## MEMORANDUM AND ORDER

GORTON, District Judge.

Plaintiff Milford Power Limited Partnership ("Milford"), an electric power producer, is a Massachusetts company with its principal place of business, a gas-fired power plant, in Milford, Massachusetts. Milford, by its general partner, Milford Power Associates, Inc. ("MPAI"), brings this action against defendant, New England Power Company ("NEP"), alleging various torts, breaches of contract and statutory violations.

NEP, a wholly-owned subsidiary of New England Electric System, is a regulated public utility engaged in the business of 1) generating and purchasing electric power, which it sells on a wholesale basis to affiliated retail electric utility companies, and 2) purchasing natural gas, which it uses as a fuel in its own power plants or sells to other power companies, such as Milford. NEP has denied Milford's claims and filed a counterclaim against Milford, MPAI and their affiliates.

Pending before this Court are the following motions:

1. Motion of defendant NEP to strike portions of the affidavit of Alan L. Hodges, the Vice President of MPAI;

2. Motion of additional defendants-in-counterclaim, Enron Corp. and Jones Capital Corp., to dismiss for lack of personal jurisdiction;

3. Motion of defendant-in-counterclaim, Milford, its general partner MPAI, and additional defendants-in-counterclaim, Enron Power Marketing, Inc. and Jones Medway, Inc., to dismiss counterclaims for failure to state a claim;

4. Special Motion of defendant-in-counterclaim, Milford, its general partner MPAI, and additional defendants-in-counterclaim, Enron Corp., Enron Power Marketing, Inc., Jones Capital Corp. and Jones Medway, Inc., to dismiss pursuant to M.G.L. c. 231, § 59H; and

5. Motion of defendant NEP to stay or dismiss proceedings on grounds of primary jurisdiction.

This Court will address the motions *seriatim.*

## I. *Background*

In December, 1989, NEP agreed to buy 56% (83 out of 149 megawatts) of the capacity and energy of a power plant that Milford had proposed to build in Milford, Massachusetts (the "Milford Plant"), pursuant to a Purchase Power Agreement. Earlier in 1989, NEP had decided to build a larger power plant (450 megawatts) of its own on Manchester Street in Providence, Rhode Island (the "Manchester Street Plant").

Milford alleges that:

1. in early 1990, NEP became aware that its prior energy forecasts had been overstated,

2. NEP concluded that it did not need energy from both the Milford Plant and the Manchester Street Plant,

3. despite the lower energy forecasts, NEP decided to proceed with its plan

to develop the Manchester Street Plant,

4. in order to obtain permission from the Rhode Island Energy Facilities Siting Board (the "Rhode Island Board") to build the Manchester Street Plant, NEP intentionally misrepresented the forecasts for energy demand in New England, and

5. because it no longer needed the 56% capacity of the Milford Plant, and because it had committed to buy that capacity at what turned out to be an inflated price, NEP wrongfully attempted to cause Milford and the Milford Plant to fail.

Milford's Complaint alleges various counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964, deceit/fraudulent inducement, negligent misrepresentation, breaches of contract and the covenant of good faith and fair dealing, interference with advantageous business relations, and violation of M.G.L. c. 93A.

NEP denies Milford's claims and has filed a counterclaim against Milford and its general partner, MPAI, and against Enron Corp., Enron Power Marketing, Inc., Jones Capital Corp., and Jones Medway, Inc. as additional defendants-in-counterclaim. In its counterclaims, NEP alleges that Milford and its affiliates participated in a civil conspiracy to blackmail NEP into buying either exorbitantly expensive electric power or the Milford Plant itself. That extortionate plan was allegedly intended to bail Milford and its affiliates out of the consequences of their ill-advised decision to build the Milford Plant and culminated in a meeting with NEP on October 21, 1994 in Westboro, Massachusetts (the "October Meeting"), at which alleged threats were made to NEP. NEP maintains that because it refused to be blackmailed, Milford filed this lawsuit against it and issued a news release alleging various wrong-doings. NEP thus claims that the defendants-in-counterclaim are liable to it for civil conspiracy, defamation, abuse of process, violation of M.G.L. c. 93A and breaches of contract and the covenant of good faith and fair dealing.

## II. *Motion of NEP to Strike Portions of the Affidavit of Alan L. Hodges*

 In support of its Motion to Dismiss for Lack of Personal Jurisdiction, Enron Corp. has submitted an affidavit from Alan L. Hodges (the "Hodges Affidavit"), vice president of MPAI. NEP seeks to strike paragraphs four and five of that affidavit, in which Mr. Hodges states that he prepared a certain document and that Richard Kinder, as a representative of MPAI and at Hodges' request, presented that document to NEP at the October Meeting in Westboro, Massachusetts. The paragraphs at issue read as follows:

4. On October 21, 1994, [Milford] met with [NEP] in Westboro, Massachusetts. In preparation for the meeting, I prepared a document which [Milford] presented to NEP at that meeting. Because I was acting as an officer of [Milford's] general partner, MP[AI], I used the letterhead of MP[AI] and created a signature line for myself as Vice President of MPAI, the managing general partner of [Milford].

5. Richard Kinder and Kenneth Rice, officers of corporate affiliates of MPAI, represented the interest of MPAI, as owners of MPAI, at the meeting with NEP on October 21, 1994. At my request on behalf of MPAI, they delivered to NEP, on behalf of [Milford's] managing general partner MPAI, the document which I had prepared.

NEP argues that because Mr. Hodges was not at the October Meeting, he has no personal knowledge from which to testify about the events that took place at the meeting, including who presented the documents to NEP. In support of that argument, NEP relies upon Fed.R.Civ.P. 56(e), which provides that affidavits submitted in the summary judgment context "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." NEP is apparently asking this Court to apply those standards to affidavits submitted in the

instant Rule 12 motion to dismiss for lack of personal jurisdiction.

Defendants-in-counterclaim, Enron Corp. and Jones Capital Corp., oppose NEP's motion to strike because they claim that the Hodges Affidavit is based upon Mr. Hodges' personal knowledge and provides admissible facts to which Mr. Hodges may testify.

■ In ruling on a motion to dismiss for lack of personal jurisdiction, this Court may go beyond the four corners of the pleadings and consider materials presented in support of that motion. *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.*, 982 F.2d 686, 690 (1st Cir.1993). Because a motion to dismiss for lack of personal jurisdiction seeks the same relief as a motion for summary judgment, the First Circuit Court of Appeals has found that "the difference in name is unimportant. In any event, the affidavits presented are available on either motion." *American Express Int'l, Inc. v. Mendez–Capellan*, 889 F.2d 1175, 1178 (1st Cir.1989) (citation omitted). It follows, then, that this Court may consider affidavits submitted in support of the instant motion to dismiss if they are based on the personal knowledge of a competent affiant.

This Court concludes that, with the exception of the last sentence of paragraph four, defendants-in-counterclaim have not shown that the remainder of paragraphs four and five were based upon Mr. Hodges' personal knowledge. At this stage in the litigation, however, the Court will receive the Hodges Affidavit for "what [it is] worth", *New England Anti–Vivisection Soc., Inc. v. United States Surgical Corp., Inc.*, 889 F.2d 1198, 1204 (1st Cir.1989) (affirming the district judge's denial of a motion to strike an affidavit for lack of personal knowledge as within the judge's discretion), and the motion to strike by NEP will be DENIED.

## III. *Motion of Enron Corp. and Jones Capital Corp. to Dismiss for Lack of Personal Jurisdiction*

Enron Corp. ("Enron") and Jones Capital Corp. ("Jones Capital") have appeared specially to file, pursuant to Fed.R.Civ.P. 12(b)(2), a motion to dismiss NEP's counterclaims against them for lack of personal jurisdiction.

Enron is a Delaware corporation with its principal place of business in Houston, Texas. Enron is the largest natural gas pipeline operator and one of the largest independent producers of oil and gas in the United States, with assets and annual revenues in the billions of dollars. Enron owns Enron Power Corp., which in turn owns MPAI, a general partner in Milford.

Jones Capital is a Delaware corporation with a principal place of business in Wilmington, Delaware. It is the development and investment arm of Jones Group, a syndicate of various construction related companies which are subsidiaries of Phillipp Holzmann AG of Germany, a multi-billion dollar international company. Jones Capital owns Jones Medway, Inc., the other general partner in Milford.

Both MPAI and Jones Medway acknowledge that the Court has personal jurisdiction over them, while Enron Power Corp. has not been made a party to this suit. Enron and Jones Capital (the "moving parties") argue that the Court lacks personal jurisdiction over them because such an exercise of jurisdiction would be inappropriate under both the Massachusetts long-arm statute, M.G.L. c. 223A, and the United States Constitution. Specifically, the moving parties argue that:

1) they are out-of-state corporations that have had no contacts with Massachusetts,

2) they have no connection to the dispute between Milford and NEP,

3) jurisdiction over their subsidiaries, MPAI and Jones Medway, should not subject *them* to this Court's jurisdiction, and

4) NEP is merely attempting to maximize the problems it causes to Milford by "striking out" at the distant owners of Milford's general partners.

### A. *Legal Analysis*

■ In deciding the pending motion to dismiss for lack of personal jurisdiction, this Court employs the prima facie standard of analysis, according to which the Court "con-

sider[s] only whether the plaintiff has proffered evidence that, if credited, is enough to support the findings of all facts essential to personal jurisdiction." *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992); *see also Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir.1995). In other words, NEP must allege and offer evidence of every fact required to satisfy both the Massachusetts long-arm statute and the due process clause of the federal Constitution. *Boit*, 967 F.2d at 675. NEP may not simply rest on unsupported allegations in the pleadings to make the prima facie showing, but "must go beyond the pleadings and make affirmative proof." *Chlebda v. H.E. Fortna & Bro. Inc.*, 609 F.2d 1022, 1024 (1st Cir.1979). This Court, in turn, must accept "properly supported proffers of evidence by [NEP] as true." *Boit*, 967 F.2d at 675.

### B. *Massachusetts Long–Arm Statute*

█ NEP contends that this Court may exercise personal jurisdiction over the moving parties pursuant to the Massachusetts long-arm statute, M.G.L. c. 223A, § 3(c), because the cause of action arises from defendants' causing tortious injury by act or omission in Massachusetts. Specifically, NEP argues that its claims against Enron and Jones Capital arise out of the October Meeting in Westboro, Massachusetts that was attended by Mr. Kinder, the president and Chief Operating Officer of Enron, and Mr. Garnett, the president of Jones Capital. NEP argues that, because Kinder and Garnett were representatives of the moving parties at that meeting, personal jurisdiction over the moving parties is warranted. In support of its argument, NEP presents evidence that, upon arriving at NEP's headquarters on the day of the October Meeting, Kinder and Garnett signed the NEP "Security/Visitor's Log" as representatives of "Enron Corp." and "Jones Capital". Affidavit of Michael E. Hachey, ¶ 16; Exh. O. NEP further alleges that neither Kinder nor Garnett qualified or disavowed that they represented Enron and Jones Capital. Hachey Aff., ¶ 17.

The moving parties respond that Kinder and Garnett did not attend the October Meeting as representatives of Enron and Jones Capital, but, rather, as representatives of MPAI and Jones Medway, Inc., respectively. As proof, they point to an agreement that Kinder, an officer of MPAI, allegedly presented to NEP at the meeting, which was on MPAI letterhead and which had a signature line that read: "Milford Power Limited Partnership, By: Milford Power Associates, Inc., Its: Managing General Partner, By: Alan L. Hodges, Vice President." Exhibit B to Counterclaim. Similarly, the moving parties offer the "Standfast Agreement" presented to NEP at that same meeting which was signed by Garnett on behalf of Milford's other general partner, Jones Medway, Inc. *Id.* Garnett, who is president of Jones Medway, Inc., has also submitted an affidavit stating that he was acting as an officer of Jones Medway, rather than Jones Capital, on that day.

The capacities in which Kinder and Garnett represented themselves at the October Meeting is thus determinative of the dispute over personal jurisdiction. NEP offers additional evidence that the appearances of Kinder and Garnett at that meeting on behalf of Enron and Jones Capital were "entirely consistent with the significant involvement both of those corporations had with the power plant project from its inception." NEP's Memorandum at 9. For example, in August, 1991, Enron told NEP that it would provide all the funds required for the construction of the Milford Plant. Hachey Aff. ¶ 9; Exh. E. One month later, Garnett, on behalf of Jones Capital, attended a meeting at NEP at which he presented his business card indicating his position with Jones Capital and tried to persuade NEP to buy the remaining 44% capacity of the Milford Plant. Hachey Aff. ¶¶ 10–11; Exh. F. Such activities, if proven, would support NEP's claim that the moving parties were actively involved with the Milford Plant project, thereby making it reasonable for NEP to assume that the parties were, in fact, represented at the October Meeting.

Given the requirement that this Court accept NEP's preferred evidence as true, the Court concludes that NEP has satisfied its

burden of establishing the jurisdiction of this Court over the moving parties under § 3(c) of the Massachusetts long-arm statute, at least with respect to the claims of civil conspiracy, violation of Chapter 93A, defamation and abuse of process, based on the alleged in-forum October Meeting alone. *See Morrill v. Tong*, 390 Mass. 120, 132, 453 N.E.2d 1221 (1983). The claims of breach of contract and of the covenant of good faith and fair dealing, however, did not arise out of the October Meeting and this Court therefore will dismiss those claims against the moving parties.

The issue then becomes whether the exercise of personal jurisdiction over the moving parties with respect to the counterclaims arising out of the October Meeting is permissible under the due process clause of the Constitution.

### C. *Due Process Clause*

■ The moving parties maintain that they had no contacts with Massachusetts because neither Jones Capital nor Enron were represented at the October Meeting. Thus, they argue that exercising personal jurisdiction over them would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

NEP counters that exercising personal jurisdiction over the moving parties comports with the requirements of constitutional due process. NEP points to the evidence contained in the "Security/Visitor's Log" and emphasizes the purposeful contacts that the moving parties had with Massachusetts in connection with their investment in and involvement with the Milford Plant prior to the October Meeting. Those contacts include correspondence and meetings held between representatives of the moving parties and NEP. NEP's reliance upon those prior activities as evidence of "minimum contacts" is misguided, however, because NEP's counterclaims admittedly arise only out of the October Meeting. *See* NEP's Memorandum at 2.

■ If personal jurisdiction is to be exercised over the moving parties because of their alleged presence and behavior at the October Meeting, it will be exercised under the doctrine of specific jurisdiction. Where, as here, a cause of action is alleged to arise directly out of the defendants' contacts within the forum state, "less is required to support jurisdiction than when the cause of action is unrelated to those contacts." *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 983 (1st Cir.1986) (citation omitted).

■ The First Circuit has established a tripartite test for determining whether the exercise of specific personal jurisdiction comports with the constitutionally-mandated minimum contacts:

First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1089 (1st Cir.1992).

#### a. *Relatedness*

As stated previously, NEP alleges that Enron and Jones Capital, through their presidents Kinder and Garnett, respectively, sought to extort NEP into either buying electric power or buying the Milford Plant at unreasonably high prices at the October Meeting. Enron, Jones Capital and others then allegedly threatened to file suit against NEP for wrongdoings, including violation of the federal RICO statute. Counterclaim ¶¶ 35–36. Because NEP refused the moving parties' alleged demands, NEP claims that they filed suit against it and published a news release containing false allegations of criminal wrongdoing by NEP.

Again, because this Court must accept the facts contained in NEP's counterclaim, affidavits and exhibits as true, the Court concludes that, with respect to its counterclaims arising out of the October Meeting, NEP has

proffered sufficient evidence that such claims directly arose out of, or are related to, the moving parties' activities in Massachusetts.

### b. *Purposeful Availment*

The second prong of the constitutional inquiry considers whether the moving parties' contacts with Massachusetts constituted a "purposeful availment" of the benefits and protections of conducting activities in that state. The First Circuit has identified two cornerstones of the purposeful availment test: voluntariness and foreseeability. *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 207 (1st Cir.1994).

Still mindful of this Court's duty to accept plaintiff's properly proffered evidence as true, the Court concludes that NEP has alleged facts sufficient to satisfy the second prong of the jurisdictional analysis. The voluntary presence of the moving parties at the October Meeting through Kinder and Garnett, notwithstanding their adamant denials that they were not so represented, and their alleged behavior at that meeting unquestionably constitute purposeful availment of the privileges and benefits of doing business in Massachusetts. The attendance of Messrs. Kinder and Garnett at the meeting was voluntary, as evidenced by the fact that Kinder suggested and initiated the meeting. Furthermore, the alleged tortious conduct of the moving parties at the meeting has been properly supported by affidavits and exhibits. The Court therefore concludes that the moving parties could have reasonably foreseen the possibility of being haled into the Massachusetts courts.

### c. *Gestalt Factors*

■ Under the third prong of the First Circuit's due process inquiry, the Court considers the following "gestalt" factors to determine whether the assertion of jurisdiction would be reasonable and comport with "fair play and substantial justice":

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the

controversy, and (5) the common interest of all sovereigns in promoting substantive social policies.

*Pleasant Street Corp.*, 960 F.2d at 1088.

■ This stage of the jurisdictional analysis evokes a sliding scale analysis:

[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.

*Ticketmaster*, 26 F.3d at 210. In alleging that jurisdiction over the moving parties is reasonable, NEP argues that the moving parties do not face a great burden in appearing because they have significant interests in the Milford Plant project. NEP also argues that Massachusetts has a significant interest in protecting its citizens from the alleged tortious injury caused by foreign defendants in this Commonwealth.

Because the first two prongs have already been satisfied, very special circumstances would have to be alleged by the defendants-in-counterclaim under the third prong in order to avoid this Court's personal jurisdiction over the moving parties. Such circumstances have not been alleged, and this Court concludes that NEP has proffered sufficient evidence to show that it is reasonable and fair to exercise personal jurisdiction over the moving parties.

Therefore, the motion of Enron and Jones Capital to dismiss the claims of NEP against them for lack of personal jurisdiction will be ALLOWED with respect to Counts II, IV and V of the counterclaim, but will otherwise be DENIED.

## IV. *Motion of Milford, MPAI, Jones Medway, Inc. and Enron Power Marketing, Inc. to Dismiss Counterclaims*

Milford, MPAI and Jones Medway, Inc. have filed a motion to dismiss all seven of the counterclaims filed against them by NEP. Enron Power Marketing, Inc., joins in the motion to dismiss to the extent that three of

the counts in the counterclaim are directed against it. Enron and Jones Capital are implicitly parties to this motion to the extent that their separate motion to dismiss on jurisdictional grounds has been denied and there remain claims asserted against them.

Pursuant to Fed.R.Civ.P. 12(b)(6), a claim cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. In deciding the instant motion, then, this Court must accept all well-pleaded factual allegations in the counterclaim as true and draw all reasonable inferences in favor of NEP. If, under any theory, the allegations by NEP are sufficient to state a cause of action in accordance with applicable law, this Court must deny the motion to dismiss. *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir.1994).

### A. Count I: Civil Conspiracy

In Count I, NEP alleges that the counterclaim defendants (hereinafter "defendants") engaged in a "civil conspiracy" and attempted to blackmail NEP into buying either 1) the remaining 44% capacity of the Milford Plant or 2) the entire Milford Plant itself. Counterclaim, ¶ 1. As previously noted, the alleged scheme of the defendants hinged on the October Meeting where they purportedly threatened to bring this lawsuit if NEP did not accede to their demands.

Under Massachusetts law, civil conspiracy is a "very limited cause of action". *Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994) (citation omitted). In order to state such a claim, plaintiff must allege that defendants, acting in unison, had some "peculiar power of coercion" over plaintiff that they would not have had if they had been acting independently. *Fleming v. Dane*, 304 Mass. 46, 50, 22 N.E.2d 609 (1939). Evidence of mere joint tortious activity by the defendants is insufficient to prove civil conspiracy. *Id.*

Milford and its affiliates move to dismiss Count I on the ground that NEP has failed to show sufficient facts to support any allegation of a "peculiar power of coercion." Milford contends that NEP's conspiracy claim is, at most, an allegation that the alleged wrongful acts were done jointly by the defendants. Therefore, the defendants argue that the Court should dismiss Count I of the counterclaim for failure to state a claim upon which relief can be granted.

NEP counters that the defendants did, in fact, have the requisite "peculiar power of coercion." More specifically, NEP argues that, because Milford is a partnership, it could not have acted unlawfully without the joint conduct of both its partners, defendants Jones Medway and MPAI, citing *Sheinkopf v. Stone*, 927 F.2d 1259, 1269 (1st Cir.1991). This Court finds that argument unpersuasive because NEP has confused the question of whether an entire partnership can be jointly and severally liable for tortious or criminal conduct of one partner, with the question before us, whether any one partner could commit the alleged tortious or criminal conduct on its own.

NEP also argues, however, that the efforts and enormous economic resources of Enron and Jones Capital, two multi-billion dollar corporations, were necessary to increase the pressure on NEP, and thus the defendants acting together possessed a unique power over NEP that they could not have exercised acting independently. At this stage in the litigation, this Court concludes that such an allegation, if proven, would support a claim for civil conspiracy. The motion of Milford and its affiliates to dismiss Count I of the counterclaim will be DENIED.

### B. Count II: Breach of Covenant of Good Faith and Fair Dealing

In Count II, NEP claims that Milford breached the implied covenant of good faith and fair dealing inherent in the Power Purchase Agreement that NEP and Milford executed in 1989, which provided that NEP would purchase 56% of the capacity of Milford's then unbuilt plant.

More specifically, NEP contends that the Power Purchase Agreement was "contingent" upon construction of the Milford Plant and that Milford "represented" that it would attempt to find other purchasers for the remaining 44% of the plant's capacity. Coun-

terclaim, ¶¶ 15, 44. On March 20, 1990, Enron allegedly "told NEP that it would not proceed to build the Power Plant unless it had pre-sold its entire output." *Id.* at ¶ 13. NEP further alleges that it

> did not expect that Milford Power would actually construct the Power Plant, unless and until it had obtained a customer or customers for at least a substantial portion of the remaining 44% of the Power Plant's power capacity, as is customary in the industry, and as NEP had been told. Moreover, both Enron and its co-investor in the Power Plant project, Jones Capital, are highly sophisticated and enormously successful companies and, even aside from their representations, NEP did not expect that they would commit to construction of the Power Plant without commitments in place for the sale of all or nearly all of the remaining power.

*Id.* at ¶ 17.

When the projected demand for power in New England fell sharply in the early 1990s, NEP claims that Enron, Jones Capital and Milford "knew, or should have known," that it would be "extremely unlikely" for Milford to find a buyer on "economically viable terms" for the remaining 44% of the Milford Plant's capacity. *Id.* at ¶ 19. Moreover, Milford was allegedly "aware" that the price NEP agreed to pay under the 1989 Purchase Power Agreement "had become greatly in excess of the then-current market value of such power...." *Id.* Although NEP negotiated with Milford to cancel the Purchase Power Agreement, Milford refused and proceeded to build the Milford Plant. NEP claims that the Milford decision to build the plant was made "despite Milford Power's knowledge that operation of the Power Plant would economically injure NEP and ratepayers" and based on "broad business objectives" other than those directly related to the economic success of the plant. *Id.* at ¶¶ 22, 47. NEP therefore claims that Milford violated the covenant of good faith and fair dealing inherent in the Purchase Power Agreement.

Milford has moved to dismiss Count II on the ground that Milford could not have breached the implied covenant of good faith and fair dealing inherent in the 1989 Agreement because it fully performed that agreement by building the Milford Plant and providing electricity to NEP. Milford argues that it did exactly as required under the Agreement and that NEP's claim arises because, with the benefit of hindsight, NEP is unhappy with the long-term rates it negotiated with Milford in 1989.

██ Under Massachusetts law, the implied covenant of good faith and fair dealing requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471, 583 N.E.2d 806 (1991) (citation omitted). NEP contends that the "fruits" of the Purchase Power Agreement were "power at an economically viable cost", yet offers no facts and cites no contractual provision in support of that allegation. This Court therefore concludes that NEP has failed to state a claim for breach of the covenant of good faith and fair dealing and the motion by Milford to dismiss Count II will be ALLOWED.

### C. *Count III: Violation of M.G.L. c. 93A*

In Count III, NEP alleges that Milford and its affiliates engaged in unfair business practices by 1) extorting NEP to enter into economic transactions disadvantageous to NEP and its customers; 2) defaming NEP and injuring NEP's business and reputation; and 3) bringing this lawsuit as part of its extortionate scheme in breach of explicit contractual obligations and the implied contractual obligation of good faith and fair dealing. Counterclaim, ¶ 53. NEP's allegations are made pursuant to M.G.L. c. 93A, § 11, which states in pertinent part:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of ... an unfair or deceptive act or practice declared unlawful by section two ... may ... bring an action....

■ Milford and its affiliates argue that this claim should be dismissed because NEP has failed to allege any "loss of money or property", as required in an action brought between businesses under § 11 of Chapter 93A. Milford contends that this requirement is strictly enforced and that "money" means "money, not time," and "property" means "the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty", citing *Baldassari v. Public Finance Trust,* 369 Mass. 33, 45, 337 N.E.2d 701 (1975). Milford argues that NEP has not alleged any out-of-pocket expenditures and NEP's claim of harm to its reputation is exactly the kind of intangible that does not qualify as "loss of property" under the *Baldassari* test.[1]

NEP responds that it has suffered and will continue to suffer damages as a result of Milford's Chapter 93A violations. Specifically, NEP argues that it has incurred substantial legal fees and other defense costs in defending the lawsuit brought against it as part of Milford's extortionate scheme. Although Chapter 93A case law holds that a party cannot recover attorney's fees for pursuing such a claim unless that party establishes other identifiable damages, *see Jet Line Services, Inc. v. American Employers Insurance Co.,* 404 Mass. 706, 718, 537 N.E.2d 107 (1989), NEP claims that its case is distinguishable because its attorney's fees are an element of the damages caused by the wrongful actions of Milford. NEP further claims that it has suffered damage to its business reputation or good will because of the alleged libel. Reputation or good will, though they may be intangible assets, are nonetheless assets that can be valued and sold.

This Court finds that, at this stage in the litigation, NEP has made allegations of a loss of money or property sufficient to survive a motion to dismiss for failure to state a claim. Accordingly, the motion by Milford and its

affiliates to dismiss Count III will be DENIED.

### D. Count IV: Breach of Contract with respect to Purchase Power Agreement

Since Milford filed its motion to dismiss Count IV of NEP's counterclaim, NEP has withdrawn part of that Count and the parties have agreed to seek resolution of the remainder of Count IV by cross-motions for summary judgment. This Court, therefore, does not reach the merits of Count IV.

### E. Count V: Breach of the Gas Purchase Contract

In Count V, NEP alleges that Milford breached the 1993 Gas Purchase Contract pursuant to which NEP agreed to supply all the fuel necessary to operate the Milford Plant. NEP seeks to enforce Article 8.3 of that Contract which obligates Milford to pay NEP $500,000 for each month after December 1, 1993 that the commercial date of operation of the Milford Plant is delayed. NEP claims that, because the opening of the Milford Plant was delayed two months, it is entitled to $1 million.

■ Milford argues that Count V should be dismissed because NEP is seeking to enforce an invalid *penalty* provision that calls for a payment of a liquidated sum in lieu of actual damages. A liquidated damages provision will be enforced only if: 1) the liquidated sum is a reasonable estimate of difficult-to-ascertain damages at the time the parties agreed to it, and 2) the sum is not grossly disproportionate to the real damages. *Colonial at Lynnfield, Inc. v. Sloan,* 870 F.2d 761, 765 (1st Cir.1989). Milford argues that this Court need not determine whether the first prerequisite is established because the $1 million penalty is grossly disproportionate to the real damages. Milford also points out that:

a) in Count II, NEP claims that it has suffered damages as a result of the *opening* of the Milford Plant,

---

1. Although the *Baldassari* case dealt with M.G.L. c. 93A, § 9, rather than § 11 as alleged here, the *Baldassari* court's definition of the "loss of money or property" requirement has been found to apply in § 11 cases. *See Halper v. Demeter,* 34 Mass.App.Ct. 299, 304, 610 N.E.2d 332 (1993); *Levy v. Bendetson,* 6 Mass.App.Ct. 558, 566–567, 379 N.E.2d 1121 (1978); *Bump v. Robbins,* 24 Mass.App.Ct. 296, 312, 509 N.E.2d 12 (1987).

b) NEP cannot have it both ways, and

c) NEP should be judicially estopped from claiming in Count V that Milford's failure to declare the Plant operational two months earlier caused damages to NEP.

NEP responds in two ways. First, it claims that the provision at issue provides for a "demand charge", not a penalty. Demand charges are fixed amounts paid by customers of interstate gas pipelines for the rights to "firm" sales or transportation on those pipelines, regardless of whether the gas is actually delivered or how much is delivered. Because the contract provides for a demand charge and not a penalty, NEP contends that it is enforceable.

Second, NEP maintains that the liquidated damages clause is enforceable because the damages provided are not grossly disproportionate or inconsistent with its other claims. NEP explains that:

1) there are two contracts involved in this case: the 1989 Power Purchase Agreement and the 1992 Gas Purchase Contract,

2) NEP is losing money under the 1989 Agreement because Milford is not providing power to NEP at market prices, but

3) NEP is still owed money under the Gas Purchase Contract because it expended resources in obtaining pipeline capacity.

NEP contends that it has alleged facts sufficient to sustain a cause of action for breach of the contractual provision in question.

This Court concludes that NEP has pled allegations which, if true, are sufficient to state a claim for enforcement of Article 8.3 of the Gas Purchase Contract. The motion by Milford to dismiss Count V, therefore, will be DENIED.

### F. Count VI: Defamation

In Count VI, NEP alleges that Milford and its affiliates defamed it by issuing a news release which reported the filing of this lawsuit and accused NEP of criminal conduct, including violations of RICO. NEP claims that the statements in the news release were false, that they subjected NEP to "ridicule and scorn" in the conduct of its business and

were a part of Milford's extortionate scheme. Counterclaim, ¶¶ 64, 65.

Milford and its affiliates argue that Count VI should be dismissed because the news release was a fair and accurate report of the allegations in their Complaint and, under Massachusetts law, such a report of judicial proceedings is privileged absent a showing of actual malice. *Thompson v. Globe Newspaper Co.*, 279 Mass. 176, 185, 181 N.E. 249 (1932). Whether Milford's news release is protected by the "fair report" privilege is a question of law to be determined by the Court. *Joyce v. Globe Newspaper Co.*, 355 Mass. 492, 498, 245 N.E.2d 822 (1969).

Massachusetts courts have identified three underlying policies that form the foundation of the "fair report" privilege:

1) the public has a right to know of official government actions that affect the public interest, 2) the only practical way many citizens can learn of these actions is through a report by the news media, and 3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report [is] fair and accurate.

*ELM Medical Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 782, 532 N.E.2d 675 (1989). While Massachusetts caselaw makes clear that the news media are privileged to make fair and accurate reports about judicial proceedings, *see Kimball v. Post Pub. Co.*, 199 Mass. 248, 85 N.E. 103 (1908), *Lundin v. Post Pub. Co.*, 217 Mass. 213, 104 N.E. 480 (1914), *Sibley v. Holyoke Transcript–Telegram Publishing Co., Inc.*, 391 Mass. 468, 461 N.E.2d 823 (1984), this Court is not persuaded that the "fair report" privilege protects the dissemination to the news media of a news release by a *party*.

Parties to a lawsuit are generally protected by a companion privilege, that is, an absolute privilege to make defamatory statements "in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Sriberg v. Raymond*, 370 Mass. 105, 109, 345 N.E.2d 882 (1976). This latter privilege rests upon a

public policy of securing to the parties the utmost freedom in their efforts to secure justice for the settlement of their private disputes. *Id.* The privilege cannot, however, be "exploited" as an opportunity to defame with immunity, and can be lost by "unnecessary or unreasonable publication to one for whom the occasion is not privileged." *Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 362, 416 N.E.2d 528 (1981) (citations omitted).

Communications by a party to the news media regarding a judicial proceeding have been found to be outside this privilege because such communications do not advance the policy upon which the privilege rests. More specifically, because such communications to the media generally will not "inhibit parties or their attorneys from fully investigating their claims or completely detailing them for the court or other parties" and are not subject to "judicial control", the necessity for the absolute privilege disappears. *Id.* (citing *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 698 (8th Cir.1979)).

This Court declines to make a definitive legal ruling as to whether either privilege is applicable to Milford's news release, because it concludes that NEP has alleged facts sufficient to demonstrate that Milford lost any privilege it might have had by intentionally publishing the statements to defame and extort NEP. NEP has presented evidence of a November 21, 1993 memorandum of Mr. Jude Rolfes ("the Rolfes Memorandum"), then the Vice President of MPAI, in which Rolfes allegedly voiced his frustration at NEP's reluctance to buy the remaining 44% capacity of the Milford Plant on terms acceptable to Milford and outlined the "hardball advantages" available to Milford:

> Let John [Rowe, NEP's President] know that we have the resolve to take this case to all levels of any judicial and/or regulatory channels available to us. We will make this a public relations nightmare out of this.

NEP relies heavily upon that memorandum, written one year before this lawsuit, to support its allegation that Milford issued its news release as part of a deliberate, calculated strategy to subject NEP to a "public

relations nightmare." Bearing in mind, as it must, the procedural posture of this case, the Court concludes that NEP's allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss. Accordingly, the motion by Milford and its affiliates to dismiss Count VI will be DENIED.

### G. *Count VII: Abuse of Process*

Count VII alleges that Milford and its affiliates filed their lawsuit against NEP "with malice and for the ulterior purpose of injuring NEP in the conduct of its business." Counterclaim, ¶ 69. NEP argues specifically that Milford and its affiliates threatened to, and actually did, bring this lawsuit for the improper purpose of 1) defaming NEP, 2) gaining a competitive advantage over NEP, and 3) interfering with the ability of NEP to conduct its business, thereby committing abuse of process. Counterclaim, ¶ 70. Many of NEP's allegations relate to the conduct of Milford and its affiliates both at, and after, the October Meeting.

 To state a valid claim for abuse of process under Massachusetts law, NEP must allege that: 1) process was used, 2) for an ulterior or illegitimate purpose, 3) resulting in damage. *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 775–76, 489 N.E.2d 185 (1986). The essence of the tort of abuse of process is the use of process as a threat to coerce or extort some collateral advantage not properly involved in the proceeding. *Broadway Management Services, Ltd. v. Cullinet Software, Inc.,* 652 F.Supp. 1501, 1503 (D.Mass.1987) (citations omitted).

 Milford argues that Count VII should be dismissed because the October Meeting merely represented an attempt to settle the dispute between the parties. Milford maintains that it suggested that NEP either buy the Milford Plant in order to compensate Milford for the damages suffered as a result of NEP's allegedly wrongful conduct, or live up to its contract with Milford to purchase the remaining 44% capacity of the Plant. Because NEP refused to do either, Milford claims to have properly filed this lawsuit.

NEP responds that it has stated a valid claim for abuse of process and cites the Rolfes Memorandum in support of its allegation that the Complaint was filed for an ulterior, illegitimate purpose. Given its duty to accept NEP's factual allegations as true, this Court concludes that NEP has alleged facts sufficient to withstand the instant motion to dismiss. The motion by Milford and its affiliates to dismiss Count VII of NEP's counterclaim will, therefore, be DENIED.

## V. *Special Motion to Dismiss Pursuant To M.G.L. c. 231, § 59H*

Milford, MPAI, Enron, Enron Power Marketing, Inc., Jones Capital and Jones Medway Inc. seek to dismiss Counts I (civil conspiracy), III (c. 93A), VI (defamation) and VII (abuse of process) of NEP's counterclaim pursuant to M.G.L. c. 231, § 59H, the "anti-SLAPP" statute.[2]

The anti-SLAPP statute was enacted on December 29, 1994, when the Massachusetts House of Representatives and Senate overrode Governor Weld's veto of the bill. The statute was drafted in response to a perceived need to protect citizens who exercised their right to speak out before public agencies, particularly those citizens concerned with real estate development projects. The legislation was intended to stop abuses by real-estate developers who attempted to silence their opponents by intimidation through groundless, expensive and protracted lawsuits. In enacting the statute, Massachusetts joined a growing number of states with anti-SLAPP statutes, including California, New York and Rhode Island.

The statute provides, in pertinent part:

In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. The court shall advance any such special motion so that it may be heard and determined as expeditiously as possible. The court shall grant such special motion, un-

less the party against whom such special motion is made shows that: 1) that the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and 2) that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

. . . . .

As used in this section, the words "a party's exercise of its right of petition" shall mean any written or oral statement made before or submitted to a . . . judicial body . . .; any written or oral statement made in connection with an issue under consideration or review by a . . . judicial body . . .; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

Prior to the Legislature's override of his veto, Governor Weld voiced his concerns about the statute in a letter to the House of Representatives dated December 9, 1994. In that letter, Governor Weld argued that the statute, as then drafted,

would greatly change the law of libel, slander and abuse of process and the procedural rules, developed over many years, governing many lawsuits. The bill applies to a broad group of potential claims, sweeping in cases that are far beyond the types of lawsuits which the bill's proponents wish to control. The bill's proponents are concerned with retaliatory lawsuits brought by developers against citizens who resort to lawful procedures to challenge real estate development. This bill as written, however, covers any claim allegedly based in any way on a statement in connection with or "likely to encourage" or to enlist public support for legislative, executive or

2. SLAPP stands for Strategic Litigation Against Public Participation.

judicial action. Effectively, the bill covers any statement on a policy issue and would thus completely change the law of libel, slander and abuse of process.

The Governor suggested amendments to the bill that would have provided a more limited mechanism to dismiss improper lawsuits brought by real estate developers against citizens.

The statute was enacted despite the Governor's misgivings and without adoption of any of his proposed amendments. Milford relies on that very fact as evidence that it was in fact the legislature's intent to "completely change the law of libel, slander and abuse of process." Milford and its affiliates contend that certain of the counterclaims against them are based on their exercise of the right of petition, namely, their filing of a complaint and issuance of a news release describing that complaint. Milford and its affiliates further argue that the doctrine of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires this federal court to apply the anti-SLAPP statute because:

1) the statute creates substantive rights by (a) creating a new "right of petition" that is deliberately broader than the right of petition under the constitution, (b) imposing liability for attorneys' fees, and (c) requiring a stay of discovery pending resolution of the motion to dismiss;

2) the statute is outcome determinative in that it precludes recovery on certain types of claims if the special motion to dismiss is granted; and

3) its application in the federal courts will discourage forum shopping, avoid the inequitable administration of laws, and effect Massachusetts public policy of encouraging public participation in all public fora.

Based on such arguments, Milford contends that those claims of NEP that are based on Milford's exercise of its right of petition now face a presumption of dismissal, unless NEP can show that Milford's Complaint and press release were 1) devoid of any reasonable factual support or arguable basis in law, *and* 2) caused actual injury to NEP.

Accordingly, Milford seeks an order of this Court to stay discovery on, and dismiss, Counts I, III, VI and VII of the counterclaim and to award attorneys' fees.

NEP argues that this motion should be denied because the anti-SLAPP statute:

1) does not apply by its terms to this case because the statute only protects a party's exercise of its constitutional right of petition, not the exercise of extortionate activities or the libelous issuance of a press release or the instigation of a baseless lawsuit against NEP;

2) is a procedural statute which conflicts with many of the Federal Rules of Civil Procedure and thus should not be applied by this federal court;

3) violates both the federal and state Constitutions because it abrogates NEP's right to a jury trial in that it requires preliminary fact finding by the judge; and

4) is inapplicable to NEP's claims which arise out of Milford's unlawful, prelitigation "scheme" to blackmail and extort NEP, and are not "based on" the exercise of Milford's alleged "right of petition".

Upon thorough consideration of the opposing arguments, this Court remains unpersuaded that the Massachusetts anti-SLAPP statute applies, or was intended to apply, to this fact situation. The term "SLAPP" originally referred to the filing of a civil complaint against a private party because of its communication with a governmental entity about a substantive issue of public or societal concern. George W. Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl.L.Rev. 3 (1989). SLAPP suits are, therefore, by definition, meritless lawsuits filed against individual citizens to intimidate them into silence. *See* John C. Barker, Common–Law and Statutory Solutions to the Problem of SLAPPs, 26 Loy.L.A.L.Rev. 395 (1993); Note, Tired of Being SLAPPed Around: States Take Action Against Lawsuits Designed to Intimidate and Harass, 25 Rutgers L.J. 401 (1994). In this Court's opinion, NEP's counterclaims against Milford do not constitute a SLAPP suit.

Nevertheless, the Court recognizes that the statute's definition of the "right to petition" is very broad, the statute is relatively new and few Massachusetts cases dealing with its scope have been published. The Court also is aware that the Massachusetts Supreme Judicial Court currently has under review a case that raises the issue of whether the anti-SLAPP statute protects only individuals from unwarranted suits, or applies to commercial entities as well. Given the unsettled status of the scope and application of the Massachusetts anti-SLAPP statute, the special motion to dismiss by Milford and its affiliates will be DENIED without prejudice.

## VI. *NEP's Motion to Stay or Dismiss Proceedings on Grounds of Primary Jurisdiction*

In December, 1994, after Milford filed the Complaint in this action, NEP filed for approval by the Federal Energy Regulatory Commission ("FERC") of its proposed new electric rates for the Manchester Street Plant. On December 28, 1994, Milford intervened in that proceeding to object to the inclusion of the costs of the Manchester Street Plant into NEP's rate base. Milford asserted that NEP's actions in repowering the Manchester Street Plant were unreasonable and imprudent because 1) NEP could have bought less expensive electricity from independent suppliers such as Milford, and 2) NEP failed to make adequate disclosures to the Rhode Island Board of internal studies which purportedly showed that the economics of the Manchester Street Plant were unfavorable.

 NEP now asks this Court to stay or dismiss all portions of Milford's Complaint relating to NEP's decision to repower the Manchester Street Plant on the grounds that the current proceedings before the FERC will be dispositive of the core issues in Milford's Complaint. NEP argues that this Court should defer to the FERC under the primary jurisdiction doctrine, which requires the Court to evaluate the following three factors in deciding whether to defer to an administrative agency:

1. whether the agency determination lies at the heart of the task assigned to the agency by Congress;

2. whether agency expertise is required to unravel intricate, technical facts; and

3. whether, though perhaps not determinative, the agency determination would materially aid this Court.

*New England Legal Foundation v. Massachusetts Port Authority*, 883 F.2d 157, 172 (1st Cir.1989).

 With respect to the first factor, NEP argues that the FERC proceeding to review and approve the proposed Manchester rates lies at the heart of the FERC's regulatory authority. Under the Federal Power Act, 16 U.S.C. § 824, the FERC has exclusive statutory authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340, 102 S.Ct. 1096, 1101, 71 L.Ed.2d 188 (1982). Because a utility may only recover prudently incurred costs in its wholesale rates, NEP alleges that the FERC "routinely" resolves allegations that a utility has imprudently built a power plant rather than obtain electricity from less costly sources.

Second, NEP claims that the FERC has specialized regulatory expertise that is "essential" in resolving Milford's claim that NEP misled the Rhode Island Board into permitting the repowering of the Manchester Street Plant. In December, 1990, the Board conditionally approved such repowering on the condition that NEP continually reassess the need for the Manchester Street Plant and commence the project "only if the need therefor continues to be apparent". NEP argues that the FERC has a unique expertise to determine whether there were such legitimate grounds for NEP's decision to repower, based on various economic projections and assumptions.

Third, NEP contends that the FERC's determination of these issues undoubtedly will be a material aid to this Court, in that such determination will:

1. shorten or even eliminate the need for weeks of expert depositions and testi-

mony on standard practices in the electric utility industry; and

2. force Milford to "sharpen the extremely broad claims in its Complaint concerning Manchester Street, resulting in a more efficient use of the Court's scarce judicial resources".

Based on such arguments, NEP asks this Court to stay, or more preferably, to dismiss without prejudice, the Manchester-related "portions" of the Complaint.

Milford responds that its Complaint is based on allegations that NEP defrauded Milford, breached its contracts with Milford, committed unfair or deceptive acts against Milford, and harmed Milford through its violations of RICO. Because the issues pending before the FERC represent only a portion of these claims, Milford argues that any determination by the FERC will not be dispositive of Milford's Complaint in this Court. If the FERC decides that NEP's decision to incur costs in repowering the Manchester Street Plant was reasonable and prudent, then the FERC will approve rates that will cause ratepayers to reimburse NEP for the costs of the plant. If the FERC decides the costs were imprudent, then it may exclude some or all of the costs from NEP's rates. Either way, Milford claims that none of the 16 counts of its Complaint will be affected.

Finally, Milford argues that NEP is attempting to misapply the doctrine of primary jurisdiction. Because Milford's claims neither implicate policies of uniformity in the FERC's ratesetting nor fall outside the conventional experience of federal district courts, *see United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), Milford urges this Court to

distinguish between lawsuits raising issues dedicated to an agency, and therefore likely to provide a ground for invoking primary jurisdiction, and lawsuits raising issues which may have some relation to an agency's powers, but which do not fall squarely within an agency's decision-making authority.

Milford's Memorandum at 10.

This Court is persuaded by Milford's arguments and concludes that, although the FERC may have primary jurisdiction over the determination of whether the construction of the Manchester Street Plant was "prudent", that issue, although perhaps related to the claims before this Court, is not dispositive of the claims here. The Court also notes that while Milford's intervention in the FERC proceeding is based on its status as a consumer of electricity, its claims in the instant lawsuit are based on its status as a seller of electric power. That distinction lends further credence to Milford's argument that it seeks different kinds of relief in the two pending proceedings. The motion by NEP to stay or dismiss the proceedings herein related to the Manchester Street Plant on the grounds of primary jurisdiction will therefore be DENIED.

### ORDER

For the foregoing reasons,

1. The motion of defendant NEP to strike portions of the affidavit of Alan L. Hodges is DENIED;

2. The motion of defendants-in-counterclaim, Enron and Jones Capital, to dismiss for lack of personal jurisdiction is ALLOWED with respect to Counts II, IV and V of NEP's counterclaim, and otherwise DENIED;

3. The motion of defendants-in-counterclaim, Milford, its general partner MPAI, Enron Power Marketing, Inc. and Jones Medway, Inc. to dismiss NEP's counterclaims is ALLOWED with respect to Count II, and otherwise DENIED;

4. The special motion of defendants-in-counterclaim, Milford, its general partner MPAI, Enron, Enron Power Marketing, Inc., Jones Capital and Jones Medway, Inc. to dismiss pursuant to M.G.L. c. 231, § 59H is DENIED without prejudice; and

5. The motion of defendant NEP to stay or dismiss proceedings on grounds of primary jurisdiction is DENIED.

So Ordered.