Donald DAVIDSON and Abbott
Laboratories, Plaintiffs,

v.

Yihai CAO, Judah Folkman, Michael S.
O'Reilly, the Children's Medical Cen-
ter Corporation and Entremed, Inc.,
Defendants.

No. CIV.A. 00–11046–DPW.

United States District Court,
D. Massachusetts.

April 11, 2002.

Kathleen B. Carr, Edwards & Angell, Boston, MA, Kimball R. Anderson, Winston & Strawn, Chicago, IL, Barbara L. Moore, Edwards & Angell, LLP, Boston, MA, Tracy J. Allen, Raymond C. Perkins, Winston & Strawn, Chicago, IL, for Donald J. Davidson, an individual, Abbott Laboratories, an Illinois corporation, Plaintiffs.

Ralph T. Lepore, III, James D. Smeallie, James D. Smeallie, Holland & Knight LLP, Boston, MA, William F. Lee, Lisa Pirozzolo, Amanda P. Masselam, Hale & Dorr, Boston, MA, James T. Lepore, for Yihai Cao, defendant.

William F. Lee, Lisa Pirozzolo, Amanda P. Masselam, Hale & Dorr, Boston, MA, for Yihai Cao, Michael S. O'Reilly, Children's Medical Center Corp., defendants.

Lisa Pirozzolo, Amanda P. Masselam, Hale & Dorr, Boston, MA, George Abrams, Boston, MA, for Judah Folkman.

John H. Henn, Donald R. Ware, Foley, Hoag & Eliot LLP, Boston, MA, for Entremed, Inc., defendant.

Kimball R. Anderson, Tracy J. Allen, Raymond C. Perkins, Winston & Strawn, Chicago, IL, Barbara L. Moore, Edwards & Angell, LLP, Boston, MA, for Donald J. Davidson, defendant.

Barbara L. Moore, Edwards & Angell, LLP, Boston, MA, for Abbott Laboratories, defendant.

**REPORT AND RECOMMENDATION RE: PLAINTIFFS' RULE 12(B)(6) MOTION TO DISMISS ENTREMED, INC.'S AMENDED COUNTERCLAIMS (DOCKET ENTRY # 181); PLAINTIFFS' MOTION TO DISMISS COUNTS I, II, III, IV, V, AND VII OF THE THIRD AMENDED COUNTERCLAIM OF YIHAI CAO, JUDAH FOLKMAN, MICHAEL S. O'REILLY AND THE CHILDREN'S MEDICAL CENTER CORPORATION (DOCKET ENTRY # 180)**

BOWLER, Chief United States Magistrate Judge.

Plaintiffs Donald Davidson ("Davidson") and Abbott Laboratories ("Abbott") (col-lectively: "plaintiffs") move to dismiss counts I, II, III, IV, V and VII of the third amended counterclaim (Docket Entry # 175) filed by defendants Yihai Cao ("Cao"), Judah Folkman ("Folkman"), Michael S. O'Reilly ("O'Reilly") and The Children's Medical Center Corporation ("CMCC") (collectively: "CMCC defen-dants"). (Docket Entry # 180). Plaintiffs also move to dismiss the amended counter-claims of defendant Entremed, Inc. ("En-tremed").[1] (Docket Entry # 181). After conducting a hearing on March 19, 2002, this court took the motions (Docket Entry ## 180 & 181) and the related filings (Docket Entry ## 18, 20, 30, 32, 34, 36, 61, 63, 76, 89, 178, 184, 187, 188, 202, 203 & 225) under advisement.

## BACKGROUND [2]

The parties' dispute centers around the inventorship of methods of using the Krin-gle 5 region of plasminogen to treat can-cer and other angiogenic diseases such as diabetic retinopathy. Folkman, Director of the Surgical Research Laboratory at Boston's Children's Hospital and a widely respected scientist in the area of cancer research, first posited the theory that tu-

---

1. Entremed filed a notice of voluntary dis-missal of counts I though V and VII of its counterclaim. Consequently, the motion to dismiss is moot as to these counts. The only remaining count is Count VI for breach of contract.

2. Background facts are taken from the facts and reasonable inferences in the counter-claims. Additional facts are included in the course of discussing the merits of the particu-lar counts. Allegations made by plaintiffs are clearly labeled as such and not considered part of the factual record.

In the course of reviewing the motions to dismiss, this court considered the documents attached to the counterclaim. See Blackstone Realty, LLC v. FDIC, 244 F.3d 193, 195 n. 1 (1st Cir.2001) (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6), Fed.R.Civ.P.). This court also con-sidered the patents attached to the amended complaint inasmuch as the parties do not dispute their authenticity and they are official public records central to the claims. See Al-ternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33–34 (1st Cir.2001); Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993). This court, however, did not consider the docu-ments attached to the various filings unless they fell within a recognized exception to the rule prohibiting such consideration under a Rule 12(b)(6), Fed. R. Civ. P., motion. For example, this court did not consider inter alia an affidavit (Docket Entry # 76, Ex. A) or excerpts of depositions submitted by both par-ties. With few exceptions, consideration of documents outside the counterclaim is im-

mors require angiogenesis[3] for their growth in a 1971 article published in *The New England Journal of Medicine.*

Since 1971, Folkman's laboratory has been a leader in the area of angiogenesis research. Indeed, his laboratory is the source of the discovery of two promising cancer drugs, angiostatin and endostatin, which are now in human clinical trials.

In early 1994, Folkman, O'Reilly and Cao[4] conceived the idea of investigating the anti-angiogenic effects of the Kringle fragments in plasminogen. Folkman theorized that tumors produce anti-angiogenic substances as well as angiogenic substances that stimulate their growth. If identified, these anti-angiogenic substances might suppress tumor growth.

In April 1994 O'Reilly and Folkman filed a patent application wherein they disclosed and claimed the discovery of the protein known as angiostatin that inhibits the proliferation of blood vessels. Entitled "Angiostatin Protein," the patent issued in June 1997 (United States Patent No. 5,639,725). Angiostatin, presently in phase I clinical trials, is part of a larger protein commonly known as plasminogen which contains five distinct regions known as

"Kringles" and one non-Kringle region known as the protease domain. Angiostatin consists of Kringles 1 through 4 of plasminogen and does not include Kringle 5.

Thereafter, O'Reilly concentrated his research in the area of *in vitro* testing of Kringles 1 through 4 on mice tumors. Meanwhile, in 1994 and 1995 Cao proceeded to investigate the anti-angiogenic effects of plasminogen fragments including Kringle 5. In order to do so, however, he needed plasminogen fragments in addition to those he prepared himself. Accordingly, in or around April 1994 Cao asked Davidson, a research biochemist at Abbott, if he could provide fragments of human plasminogen for Cao's research at Children's Hospital.

In late May 1994 Davidson supplied Cao with approximately 750 milligrams of human plasminogen. At the time, Davidson did not request a confidentiality agreement or otherwise indicate that the fragments were proprietary to Abbott. In March 1995, again without a confidentiality agreement, Davidson furnished Cao with one milligram of recombinant Kringle 1.

In early June 1995 Davidson sent Folkman a confidentiality agreement ("CDA")

proper when reviewing a motion to dismiss unless the court converts the motion to one for summary judgment. *See Alternative Energy v. St. Paul Fire and Marine,* 267 F.3d at 33; *Watterson v. Page,* 987 F.2d at 3 ("consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment"). Inasmuch as this court did not take cognizance of the supplementary materials, no conversion of the motion to dismiss into a motion for summary judgment occurred. *See Garita Hotel Limited v. Ponce Federal Bank,* 958 F.2d 15, 18–19 (1st Cir.1992) (test for conversion is whether district court "actually took cognizance of [the supplementary materials]").

3. Angiogenesis is the process of forming new blood vessels. Tissues in need of an in-

creased blood supply release angiogenic substances which stimulate the endothelial cells in blood vessels to multiply off the parent blood vessel and sprout hollow tubes. These tubes then connect with other blood vessels and establish an open vascular system through which blood then circulates.

4. O'Reilly worked as a researcher at Children's Hospital from 1991 through 2000. He currently resides in Houston, Texas and is on the faculty of the M.D. Anderson Cancer Center. Cao worked in the Department of Surgical Research at Children's Hospital from November 1993 to July 1, 1996. He presently resides in Stockholm, Sweden as a faculty member at the Karolinska Institute in Stockholm.

signed by Abbott.[5] Back dated to April 1995, the CDA attached to the complaint and the amended complaint contains no revisions, underlinings or markings by Christopher Dippel ("Dippel"), an officer in Children's Hospital's Technology Transfer Office. The first sentence of the CDA provides that, "Subject to the full execution of this Agreement," Abbott will provide the Kringle fragments.[6]

The broad language of the CDA contains a provision stating that Children's Hospital "agrees that any ... inventions ... made or developed independently by Abbott or by [Children's] Hospital ... as a result of exposure to Abbott's [Kringle fragments] ... shall be promptly disclosed to Abbott and shall be the sole property of Abbott." (Amended Complaint ("AC"), No Docket Entry No. Assigned, Filed Dec. 3, 2001, Ex. B, ¶ 5). The CDA also includes a provision giving Abbott a six month period to exercise an exclusive option to purchase the Children's Hospital's share of any joint invention resulting from studies at Children's Hospital utilizing the Kringle fragments from Abbott. In short, the CDA strongly favored Abbott and disfavored Children's Hospital.

When Folkman received the CDA, he signed it without reviewing it in any detail and forwarded it to the Technology Transfer Office. Dippel reviewed the agreement, determined it was unacceptable to Children's Hospital and, as a result, never signed the CDA or returned it in an executed form to Abbott. Rather, he made various revisions, underlinings and markings on the CDA.[7]

By letter dated July 5, 1995, Dippel sent Davidson an alternate proposal based on the Uniform Biological Materials Transfer Agreement ("the UBA"). The cover letter advised Abbott that the UBA would be Children's Hospital's "version of an agreement for" the transfer of the material from Abbott. In sharp contrast to the CDA, the UBA proposed that Children's Hospital would be "free to file patent applications" and claim inventions through the use of the material supplied by Abbott.

Meanwhile, on June 22, 1995, Davidson sent Cao samples of Kringle 1, Kringle 1–3 and Kringle 1–4 as well as recombinant mini-plasminogen. CMCC did not inform Abbott that the CDA was not acceptable before Davidson sent these fragments to Cao. Nor did CMCC ever return these or other fragments received from Abbott.

In mid-October 1995, Davidson sent Cao additional samples of Kringle fragments, including a novel Kringle 5. This novel

---

5. Plaintiffs include the CDA as exhibit B to the amended complaint. They also attached the CDA as an exhibit to the complaint.

In the complaint, plaintiffs never stated that a fully signed CDA or even the CDA signed by Folkman alone had not been delivered back to plaintiffs. The CDA contains a choice of law clause dictating the application of Illinois law. Under Illinois law, a contract must be delivered to create a binding agreement. *Glabman v. Bouhall*, 81 Ill.App.3d 966, 36 Ill.Dec. 852, 401 N.E.2d 990, 993 (1980) (delivery and acceptance of written contract necessary to be binding). The CMCC defendants argue that this material omission supports their fraud on the court count in the counterclaim. The CDA forms the basis of plaintiffs' breach of contract claim in Count III of the complaint and Count IV of the amended complaint.

6. Arguably, the November 8, 1995 letter from Abbott's Project Leader to Folkman impliedly acknowledges the continued vitality of this condition. It is also worth noting that the CDA defines "Kringles Fragments" as "Kringles Fragments 1 and 1–3" as opposed to Kringle 5.

7. The CMCC defendants argue that plaintiffs fraudulently edited and redacted Dippel's markings and submitted the clean copy to the court attached as an exhibit to the complaint and amended complaint.

Kringle 5 was the first Kringle 5 that Folkman's laboratory received from any source. In return, Cao continued to share experimental results with Davidson in the summer and fall of 1995.[8]

In November 1995 Davidson's supervisor, Jack Henkin ("Henkin"), wrote to Folkman and proposed a "gentlemen's agreement" under which Davidson would supply Children's Hospital with Kringle fragments "with the understanding that the techniques and knowledge of [Folkman's] lab would be readily available to us." Henkin also suggested allowing Davidson to visit Folkman's lab. Shortly after receiving the letter, Folkman telephoned Henkin and declined the proposal.

In December 1995 a provisional patent application naming Folkman and Cao as inventors[9] was filed on the use of Kringle 5 to inhibit endothelial cell growth. At the time, the only Kringle 5 fragment tested was the novel Kringle 5 provided by Davidson. The application eventually issued as United States Patent No. 5,854,221 ("the '221 patent") on December 28, 1998, with CMCC as the assignee. Entitled "Endothelial Cell Proliferation Inhibitor and Method of Use," the '221 patent claims, *inter alia*, a method of inhibiting endothelial cell proliferation *in vitro* by administering a Kringle 5 peptide and a method of treating an individual with an angiogenesis mediated disease with a Kringle 5 peptide.[10]

In January 1996 Abbott sent Folkman two copies of a different Confidential Disclosure Agreement ("CDA–2") signed by an Abbott official. CDA–2 proposed that Abbott supply Children's Hospital with Kringle 5 fragments, Kringle 5 peptides and proprietary information relating to angiogenesis inhibitors. Under CDA–2, "Information and any developments material-

8. Plaintiffs allege that after providing Cao with the material, Davidson worked at isolating Kringle fragments and exploring the anti-angiogenic properties of Kringle 5. According to plaintiffs, Davidson devised the above noted novel Kringle 5 fragment and determined that this novel Kringle 5 had greater anti-angiogenic potency than angiostatin. Abbott later applied for and was issued two patents based on Davidson's Kringle 5 discovery, as alleged by plaintiffs. The first patent, No. 5,801,146 ("the '146 patent"), issued on September 1, 1998. The '146 patent claimed Kringle 5, isolated from mammalian plasminogen, as a method for treating patients in need of anti-angiogenesis therapy. The second patent, No. 5,981,484 ("the '484 patent"), claimed a method of treating patients in need of anti-angiogenesis therapy with a therapeutically effective amount of a mammalian Kringle 5 peptide fragment. This second patent is based on a continuation in part of the application for the '146 patent. Davidson is the named inventor and Abbott is the assignee on both patents.

9. O'Reilly was later added as an inventor.

10. In the amended complaint, plaintiffs allege that Folkman, Cao and O'Reilly based their invention on Davidson's novel Kringle 5. In Count I of the amended complaint, plaintiffs maintain that Davidson should be the named inventor on the '221 patent as well as on related United States and foreign patent applications based on Davidson's Kringle 5 invention. Counts II and III are respectively for misappropriation of trade secrets and unjust enrichment. In essence, plaintiffs allege that Folkman, O'Reilly and Cao acquired the information about the anti-angiogenic properties of Kringle 5 from Davidson under an obligation of secrecy and confidentiality and then used the proprietary information for their own benefit to obtain the '221 patent.

In Count IV, plaintiffs allege that the CMCC defendants breached the CDA inasmuch as Folkman signed the CDA and CMCC ratified the CDA. Plaintiffs additionally seek a declaratory judgment invalidating agreements between CMCC and Entremed relating to the Kringle 5 discovery. Alternatively, plaintiffs submit that the '221 patent is invalid for various reasons, including anticipation, best mode and inequitable conduct before the United States Patent and Trademark Office ("PTO").

ly based thereon are and shall remain the sole property of Abbott and [Children's Hospital] will assert no patent, copyright or other claim to such information or developments." (Docket Entry # 175, Ex. D).

In a letter dated February 1, 1996, Dippel rejected the proposal and informed Abbott that "there is some misunderstanding between the two parties." (Docket Entry # 175, Ex. E). Dippel, in turn, asked Abbott to send him a materials transfer agreement under which Children's Hospital would agree not to give material supplied by Abbott "to anyone else, to share data with Abbott, and to acknowledge the source of the material in publication." (Docket Entry # 175, Ex. E).

In May 1996 Abbott filed a patent application which eventually issued as the '146 patent claiming a method for treating patients with angiogenic diseases with therapeutically effective amounts of Kringle 5. The CMCC defendants contend that the '146 patent was the direct result of information Cao provided to Davidson including the idea to investigate the anti-angiogenic properties of various plasminogen fragments and the methods for conducting such research.[11] In fact, Davidson told Cao in early 1996 that he would include Cao on any patent application filed on work derived from his discussions with Cao.

During the prosecution of the '146 patent, plaintiffs represented that Davidson was the sole inventor of the claimed invention. They did not advise the PTO that Davidson acquired the idea that plasminogen fragments could inhibit endothelial cell growth from Folkman, O'Reilly and Cao. Nor did Davidson disclose to the PTO that he had acquired the methods and the means to conduct the necessary research from Folkman, O'Reilly and Cao.[12]

In April 1997 Davidson, as the inventor, and Abbott, as the assignee, filed a continuation in part application which eventually issued as the '484 patent on November 9, 1999. In January 1999 the patent examiner rejected the April 1997 application for the '484 patent because it was anticipated by the '221 patent. In response, Davidson averred to the examiner that he had conceived and reduced to practice his invention prior to the December 13, 1995 provisional patent application which led to the '221 patent. In so doing, Davidson did not disclose that he had acquired his knowledge from Cao.

In July 1997 CMCC first published the patent application on Kringle 5. In September 1997 Abbott's attorney contacted Children's Hospital, asserted that Davidson was the inventor and demanded that Children's Hospital assign all rights to the '221 patent to Abbott. CMCC refused but embarked on informal discussions with Abbott that also included Entremed in the fall of 1997 in an attempt to resolve the inventorship issue. Pursuant to confidentiality agreements, the parties exchanged "confidential information,"[13] including lab

---

11. Accordingly, Count VI of the counterclaim seeks to substitute Folkman, O'Reilly and Cao as the named inventors of the '146 patent in lieu of Davidson under 35 U.S.C. § 256.

12. For example, in August 1995 Cao sent Davidson the protocol of "the sophisticated BCE assay" used at Children's Hospital to test the inhibitory effect of plasminogen fragments. In September 1995 Cao sent Davidson a protocol of how to grow and maintain BCE cells. In November 1995 Children's Hospital sent Davidson a batch of BCE cells.

13. The counterclaim's use of the term "confidential information" to describe the disclosed documents supports the inference that such documents fell within the reach of both confidentiality agreements notwithstanding the absence of any stamped marking. To the extent the descriptive term "confidential" is borderline, the factual specificity of the counterclaim

notes, the CDA with Dippel's handwritten notes and markings and other documents.

Abbott and CMCC entered into the first confidentiality agreement in October 1997 ("the 1997 CDA"). Abbott and Entremed entered into another confidentiality agreement in May 1998 ("the 1998 CDA"). Plaintiffs obtained the CDA in June 1998 during the informal discussions over the inventorship dispute. Both agreements contain choice of law clauses requiring the application of Illinois law. They also prohibit the receiving party from disclosing any of the documents received under the agreements to more than the minimum number of the receiving party's employees. Each agreement also provided that the disclosure of confidential information would be "inadmissible by the [r]eceiving [p]arty in any subsequent legal ... proceeding." (Docket Entry # 175, Ex. F & G).

The 1997 CDA with CMCC defines "confidential information" as written or oral information "identified as 'Confidential' at the time of disclosure." (Docket Entry # 175, Ex. F). In slight contrast, the definition of "confidential information" in the 1998 CDA with Entremed required that written information be "marked 'confidential'" and that oral information be identified as confidential at the time of disclosure, reduced to written form within 30 days and then marked confidential. (Docket Entry # 175, Ex. G).

During the discussions, Abbott threatened to publicly embarrass Folkman if its demands were not met. The discussions ended in the early fall of 1998 without a resolution of the inventorship dispute.

In May 2000, shortly before plaintiffs filed this lawsuit, Abbott contacted Children's Hospital and repeated its demand to add Davidson as a named inventor on the '221 patent and to assign all rights to the '221 patent to Abbott. Abbott informed Children's Hospital that it would file suit if its demand were not met.

On May 30, 2000, plaintiffs filed the complaint which contains many of the same allegations in the previously described amended complaint.[14] The CMCC defendants argue that the complaint contains false allegations that CMCC had a contractual obligation to cede the Kringle 5 invention to Abbott based on the CDA, that Folkman, O'Reilly and Cao stole the proprietary information about Kringle 5 from plaintiffs and that Davidson was the first to determine that Kringle 5 had anti-angiogenic properties and was therefore the true inventor of the invention claimed in the '221 patent. The complaint and amended complaint also inaccurately quote excerpts from Folkman's laboratory meeting minutes as stating that the CMCC defendants "'agreed' that they had 'overlooked' Kringle 5." [15]

Abbott discussed the allegations in the lawsuit with the press. Abbott also disseminated the false allegations in the complaint to the press resulting in articles published in newspapers such as *The New York Times* and *The Boston Globe* as well as scientific journals. The dissemination inevitably damaged the reputations of Folkman, Cao and O'Reilly.

---

cures any deficiency. *See DM Research, Inc. v. College of American Pathologists,* 170 F.3d 53, 56 (1st Cir.1999).

**14.** See footnote number ten.

**15.** Plaintiffs acquired the lab notes under the terms of either the 1997 or the 1998 CDA. In Count III, the CMCC defendants condemn this improper use of the lab notes as a violation of the 1997 or 1998 CDA.

*I. PLAINTIFFS' MOTION TO DISMISS COUNTS I, II, III, IV, V, AND VII OF THE THIRD AMENDED COUNTERCLAIM OF YIHAI CAO, JUDAH FOLKMAN, MICHAEL S. O'REILLY AND THE CHILDREN'S MEDICAL CENTER CORPORATION (DOCKET ENTRY # 180)*

In reviewing the motion to dismiss the CMCC defendants' counterclaim, as well as in reviewing the motion to dismiss Count VI in Entremed's counterclaim, this court accepts the factual allegations in the counterclaims as true and makes all reasonable inferences in favor of the CMCC defendants and/or Entremed. *See Alternative Energy v. St. Paul Fire & Marine,* 267 F.3d at 33 (on motion to dismiss, court accepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs"). Dismissal is proper "only if, under the facts alleged," the CMCC defendants and/or Entremed "cannot recover on any viable theory." *Blackstone Realty LLC v. FDIC,* 244 F.3d 193, 197 (1st Cir.2001) (internal quotation marks omitted); *accord State Street Bank and Trust Company v. Denman Tire Corporation,* 240 F.3d 83, 87 (1st Cir.2001) (dismissal appropriate "only if it 'appears to a certainty that the plaintiff would be unable to recover under any set of facts'").

Turning to plaintiffs' motion to dismiss the CMCC defendants' counterclaim, plaintiffs move to dismiss the following counts: (1) defamation (Count I); (2) fraud on the court (Count II); (3) breach of contract (Count III); (4) violation of section 11 of Massachusetts General Laws chapter 93 ("chapter 93A"); (5) inequitable conduct (Count V); and (6) abuse of process (Count VII). This court turns *seriatim* to these counts and to plaintiffs' arguments for their dismissal.

*1. Defamation*

Plaintiffs seek to dismiss the defamation count under Rule 12(b)(6), Fed.R.Civ.P. ("Rule 12(b)(6)"), on the basis that it fails to state a cause of action for defamation. As an initial matter, it is necessary to resolve whether Illinois or Massachusetts law applies to the defamation count.

■ "A federal court ... adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989); *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see, e.g., Estates of Ungar Ex Rel. Strachman v. Palestinian,* 153 F.Supp.2d 76, 98 (D.R.I.2001) (applying choice of law rules of forum state to determine substantive law applicable to state law claims over which court had supplemental jurisdiction in action based on federal statute and federal question jurisdiction). Examining Massachusetts choice of law rules in tort actions, Massachusetts does not strictly adhere to the rule of *lex loci delicti* and, instead, employs a more flexible approach. *Eagle–Picher Industries v. Liberty Mutual Insurance Company,* 829 F.2d 227, 247–248 (1st Cir.1987); *Alves v. Siegel's Broadway Auto Parts, Inc.,* 710 F.Supp. 864, 869–870 (D.Mass. 1989). The SJC thus "refuse[s] to bind itself to a single choice of law doctrine" applicable to torts. *Reisch v. McGuigan,* 745 F.Supp. 56, 59 (D.Mass.1990); *see Alves v. Siegel's Broadway Auto Parts, Inc.,* 710 F.Supp. 864, 870 (D.Mass.1989) (collecting Massachusetts state and federal cases using different approaches). Rather, Massachusetts courts assess "'various choice-influencing considerations,'" including those provided in the "*Restatement (Second) Conflict of Laws* (1971)." *Cosme v. Whitin Machine Works, Inc.,* 417 Mass. 643, 632 N.E.2d 832, 834 (1994); *accord*

*Continental Cablevision, Inc. v. Storer Broadcasting Company,* 653 F.Supp. 451, 454 (D.Mass.1986); *see Bushkin Associates, Inc. v. Raytheon Company,* 473 N.E.2d 662, 670 (D.Mass.1985); *see also American Management Services, Inc. v. George S. May International Company,* 933 F.Supp. 64, 69 (D.Mass.1996) (quoting *Cosme* ).

■ Section 150 of the *Restatement (Second) of Conflict of Laws* (1971) addresses the issue of what law to apply where, as here, publication took place in several states.[16] Under section 150, unless another state has a more significant relationship under the principles set forth in section six,[17] the law of the state where the defamed person was domiciled at the time of publication applies "if the matter complained of was published in that state." *Restatement (Second) of Conflict of Laws* § 150(2) & comment b (1971). Similarly, for corporations such as CMCC, unless another state has a more significant relationship under the principles set forth in section six, the law of the state where the corporation has its principal place of business at the time of the publication applies "if the matter complained of was published in that state." *Restatement (Second) of Conflict of Laws* § 150(3) (1971).

Plaintiffs published the defamatory statements by filing the complaint and then unnecessarily distributing the complaint to news organizations including *The Boston Globe.* (Docket Entry #175, ¶¶ 78–79 & 85). At or around the time plaintiffs filed the complaint in May 2000, O'Reilly and Folkman resided in Massachusetts and Cao resided in Stockholm. CMCC's principal place of business was in Massachusetts. (Docket Entry #175, ¶¶ 6–7, 78–79 & 85). Under the principles set forth in the *Restatement (Second) of Conflict of Laws* (1971), the law of Massachusetts therefore applies to O'Reilly, Folkman and CMCC's defamation claims against plaintiffs inasmuch as section six does not dictate otherwise.

As to Cao, section six militates in favor of applying Massachusetts law. Massachusetts has a legitimate interest in protecting the reputations of its research hospitals and the research scientists in its medical community.[18] The location of the anti-angiogenic research of Folkman, O'Reilly and Cao in a Boston laboratory creates a justified expectation that Massachusetts law would apply to any tort arising out of such research. Uniformity of result supports the application of Massachusetts law to Cao's defamation claim in conformity with the application of such law to O'Reilly's, Folkman's and CMCC's defamation claims. Finally, the ease of determining and applying Massachusetts, as opposed to Swedish law, weighs in favor of the application of Massachusetts law. This court therefore concludes that Massachu-

16. The "concerns" arising when the forum state has little connection to a so-called multistate defamation claim, *see Keeton v. Hustler Magazine, Inc.,* 828 F.2d 64, 66 (1st Cir.1987), do not arise inasmuch as Massachusetts has a significant relationship to all of the defamation claims.

17. Section six lists a number of factors to consider in determining the appropriate law. The list includes "the relative interests of [interested] states in the determination of the particular issue," "the protection of justified expectations," the "uniformity of result" and the "ease in the determination and application of the law to be applied." *Restatement (Second) of Conflict of Laws* § 6(2)(f) & (g) (1971).

18. Illinois' interest in a private corporation and the reputation of an employee is less than Massachusetts' interest. Abbott also maintains manufacturing and research facilities in Bedford, Massachusetts thereby strengthening Massachusetts' interest in the present dispute.

setts law applies to Count I of the counter-claim.

As the basis to dismiss the defamation count, plaintiffs argue that statements made in a complaint and the distribution of that complaint to the media are absolutely privileged. They additionally assert that the CMCC defendants do not identify any defamatory statements other than generally alleging that Abbott discussed the complaint with the media.

■ As to the first two arguments, it is true that, "[S]tatements by a party, counsel or witness in the institution of ... a judicial proceeding are absolutely privileged provided such statements relate to the proceeding." *Sriberg v. Raymond,* 370 Mass. 105, 345 N.E.2d 882, 883 (1976); *accord Restatement (Second) of Torts* § 586 (1976). The privilege rests on the "policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." *Sriberg v. Raymond,* 345 N.E.2d at 884; *accord Milford Power Limited Partnership v. New England Power Company,* 918 F.Supp. 471, 485–486 (D.Mass.1996) (quoting *Sriberg*). Simply filing the complaint containing the false assertions that CMCC had a contractual obligation to cede the Kringle 5 invention to Abbott and that the CMCC defendants stole plaintiffs' Kringle 5 invention, without more, does not state a claim for defamation. *See Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 416 N.E.2d 528, 533 (1981).

Plaintiffs, however, did more than simply file the complaint. They affirmatively and unnecessarily disseminated the complaint containing the false statements to the press. (Docket Entry # 175, ¶ 78). Consequently, their conduct falls squarely within the reach of the limitation to the privilege carved out in *Sullivan.* As expressed in *Sullivan,* "[T]he privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged." *Sullivan v. Birmingham,* 416 N.E.2d at 530. "Allowing defamation suits for communications to the news media will not generally inhibit parties or their attorneys from fully investigating their claims," *Sullivan v. Birmingham,* 416 N.E.2d at 531,[19] and, therefore, does not interfere with the underlying policy rationale for the privilege.

Plaintiffs also complain that the CMCC defendants do not identify the defamatory statements or allege that Abbott said anything that was false. As to the latter, the counterclaim is replete with references to the falsity of the statements in the complaint including, *inter alia,* paragraph 76. The *Reppucci*[20] case cited by plaintiffs is distinguishable on the basis that it involved a summary judgment motion. The counterclaim sufficiently identifies the false statements for purposes of a motion to dismiss and also refers to the publications wherein the defamatory statements in the complaint were repeated.

■ Finally, plaintiffs' citation to *Lykowski v. Bergman,* 299 Ill.App.3d 157, 233 Ill.Dec. 356, 700 N.E.2d 1064, 1069–

**19.** Although other jurisdictions may extend the privilege to distributing a complaint to the media, *see, e.g., Hill v. Herald–Post Publishing Company,* 877 S.W.2d 774, 783 (Tex.App. 1994), *aff'd in part and rev'd in part,* 891 S.W.2d 638 (Tex.1994); *Kelley v. Bonney,* 221 Conn. 549, 606 A.2d 693, 707 (1992), this court must adhere to Massachusetts law. Plaintiffs' reliance on *Grossman v. Perry,* 1999 WL 1318984 at * 1 (Mass.Super. April 15, 1999), is misplaced inasmuch as the claim at issue was an abuse of process claim as opposed to a defamation claim.

**20.** *Repucci v. Salem News Publishing Company,* 1994 WL 903010 at * 2 (Mass.Super. Oct.10, 1994).

1070 (1998), and their accompanying argument that the defamation count does not allege "with particularity to whom the defamatory statements were communicated" (Docket Entry # 34) misunderstands the pleading requirements applicable to a defamation claim in federal court. To state the obvious, "[T]he Federal Rules of Civil Procedure, not state rules, govern the adequacy of the pleading." *Baxter Travenol Laboratories, Inc. v. LeMay,* 93 F.R.D. 379, 381 (S.D.Oh.1981) (examining sufficiency of counterclaim for defamation); *accord Barber v. Nationwide Communications, Inc.,* 1995 WL 940517 at * 3 (N.D.Tx.1995) (adequacy of defamation plaintiff's pleading in federal court "is judged according to the Federal Rules of Civil Procedure"). Consequently, the strict pleading requirements for defamation at common law do not apply in federal court. *Baxter Travenol Laboratories, Inc. v. LeMay,* 93 F.R.D. at 381.

Defamation claims are subject to the more relaxed pleading requirements of Rule 8, Fed.R.Civ.P., as opposed to Rule 9, Fed.R.Civ.P. *Croixland Properties Limited Partnership v. Corcoran,* 174 F.3d 213, 215 n. 2 (D.D.Cir.1999) ("Federal Rules of Civil Procedure impose no special pleading requirements for defamation"); *Geisler v. Petrocelli,* 616 F.2d 636, 640 (2d Cir.1980) ("pleading defamation is governed by Rule 8, Fed.R.Civ.P., which requires only that [the] plaintiff's charges be set forth in a short and concise statement"); *Markovic v. New York City School Construction Authority,* 2000 WL 1290604 at *3 (Sept. 13, 2000) (defamation claims "have *expressly* been found to be subject to Fed.R.Civ.P. 8(a) and *not* a more heightened standard of pleading"); *DeSalle v. Key Bank of Southern Maine,* 685 F.Supp. 282, 283 (D.Me.1988) ("defamation claim need only satisfy the Federal Rules of Civil Procedure" which only require a short plain statement of the claim). Federal courts

"consistently refuse[ ] to require plaintiffs to set forth allegedly defamatory statements *en haec verbis.*" *Barber v. Nationwide Communications, Inc.,* 1995 WL 940517 at * 3 (N.D.Tx.1995).

The counterclaim states that Abbott disseminated and discussed the complaint and the allegations contained therein with the press. It identifies the place by naming the various newspapers containing the false and defamatory statements and reasonably infers the time as at or around the time of the May 2000 filing of the complaint. *See generally Mesiti v. Microdot, Inc.,* 739 F.Supp. 57, 66 (D.N.H.1990). Such specificity more than satisfies federal pleading standards. *See, e.g., Stabler v. New York Times Company,* 569 F.Supp. 1131, 1138 (S.D.Tx.1983); *Baxter Travenol Laboratories, Inc. v. LeMay,* 93 F.R.D. at 381. In sum, the defamation count is not subject to dismissal.

### 2. *Fraud on the Court*

Count II of the counterclaim alleges a cause of action based on "fraud on the court." Plaintiffs move to dismiss the count because it cannot be brought as a counterclaim and because the facts alleged do not amount to a fraud on the court.

■ Addressing the former argument, plaintiffs correctly note that, "[F]raud on the court is not recognized as an independent cause of action in Massachusetts." *National Engineering Service v. Galello,* 1995 WL 859241 at * 2 (Mass.Super. May 9, 1995). Fraud on the court, however, has its genesis in the federal court's inherent power to regulate and control abusive litigation tactics effecting the institutional integrity of the court. *See Aoude v. Mobil Oil Corporation,* 892 F.2d 1115, 1117–1118 (1st Cir.1989). Accordingly, it is not an issue of state law. Logically, the equitable power to dismiss a case because of a fraud

on the federal court is governed by federal common law. Not only did the First Circuit in *Aoude* rely exclusively on federal case law in limning the doctrine [21] but the Second Circuit in *JC's East, Inc. v. Traub*, 92 F.3d 26 (2d Cir.1996), expressly views fraud on the court as an issue of federal law. *JC's East, Inc. v. Traub*, 92 F.3d at 26 (further describing New York contract law as "irrelevant").

■ Federal law permits an independent action to attack and vacate a prior judgment for fraud on the court. Rule 60(b), Fed.R.Civ.P.; *Hazel–Atlas Glass Company v. Hartford–Empire Company*, 322 U.S. 238, 245–248, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). This inherent power lies in equity and is "characterized by flexibility which enables it to meet new situations which demand equitable intervention." *Hazel–Atlas Glass Company v. Hartford–Empire Company*, 322 U.S. at 248, 64 S.Ct. 997. In *Hazel*, the majority needed such flexibility in order to bypass the longstanding principle that a court lacks the power to reexamine a judgment after expiration of the term in order to provide relief from that judgment. *See Hazel–Atlas Glass Company v. Hartford–Empire Company*, 322 U.S. at 244 & 255, 64 S.Ct. 997 (majority recognizing rule that federal courts "would not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered" with dissent citing numerous cases for the rule). Similarly, there is often a need to permit an independent action to relieve a party from a judgment under the inherent power of a court due to the expiration of the time frames set forth in Rule 60(b), Fed.R.Civ.P.[22] *See, e.g., In Re R & R Associates of Hampton*, 248 B.R. 1, 5 (Bkrtcy.D.N.H.2000) (finding Rule 60(b)(3) motion untimely but construing complaint as seeking damages in independent action for fraud on court).[23]

■ In the case at bar, however, there is no need to overlook or bypass the proper procedure for bringing the present fraud on the court before the court. That procedure in the form of a motion to dismiss remains fully available to the CMCC defendants.[24]

Numerous federal courts allow parties to file motions to dismiss due to a fraud on the court. *See, e.g., Aoude v. Mobil Oil Corporation*, 892 F.2d at 1117 (motions to dismiss raising fraud on court); *Derzack v. County of Allegheny, Pennsylvania*, 173 F.R.D. 400, 412–413 (W.D.Pa.1996) (allowing motion to dismiss amended complaint due to fraud on court); *McDowell v. Seaboard Farms of Athens, Inc.*, 1996 WL 684140 at * 1–2 (M.D.Fla. Nov.4, 1996) (allowing motion for involuntary dismissal due to fabrication of evidence as fraud on

---

**21.** The court's single citation of a state court case occurred in the context of discussing the *in pari delicto* doctrine. *See Aoude v. Mobil Oil Corporation*, 892 F.2d at 1121 (citing *Pantely v. Garris, Garris & Garris, P.C.*, 180 Mich.App. 768, 447 N.W.2d 864, 868 (1989)).

**22.** Unlike the bases for relief set forth in Rule 60(b)(1)-(6), Fed.R.Civ.P., fraud on the court has no set time limit. *See In Re R & R Associates of Hampton*, 248 B.R. at 5 (unlike Rule 60(b)(3), Fed.R.Civ.P., "relief for fraud on the court is not limited by a one year time limitation"); 12 James Wm. Moore *Moore's Federal Practice* § 60.21[4][g] (2001) (no time limit applicable to relief based on fraud on court).

**23.** The *Hampton* decision is therefore distinguishable from the circumstances in the case at bar for this reason as well as the decision's reliance, discussed *infra*, on the savings clause in Rule 60(b), Fed.R.Civ.P.

**24.** Requiring the CMCC defendants to bring their allegations by motion would only *elevate* form over substance if this court foreclosed the CMCC defendants' ability to bring the argument through any procedure.

court). The court's ability to dismiss an entire action due to a fraud on the court may arise under various statutory rules, *see Pope v. Federal Express Corporation,* 138 F.R.D. 675, 681–683 (W.D.Mo.1990) (discussing ability to dismiss action under Rules 11, 26(g) and 41(b), Fed.R.Civ.P.),[25] or under the inherent power of the court. *See Derzack v. County of Allegheny, Pennsylvania,* 173 F.R.D. 400, 412–413 (W.D.Pa.1996) (exhaustively listing cases wherein courts use their inherent power to curb misconduct when it constitutes fraud on court by dismissing action or entering other sanctions).

To support their ability to bring the fraud on the court claim in the counterclaim, the CMCC defendants cite to *In Re R & R Associates of Hampton,* 248 B.R. 1 (Bkrtcy.D.N.H.2000) (denying motion to dismiss fraud on the court claim attacking, *inter alia,* bankruptcy court's prior approval of the defendants as counsel for debtor). As correctly posited by plaintiffs, the court in *Hampton,* which allowed the trustee to maintain an independent action for damages, heavily relied on the savings clause in Rule 60(b), Fed.R.Civ.P., which acknowledges a court's continued ability "to entertain an independent action to relieve a party from a *judgment, order or proceedings* ... or to set aside a *judgment* for fraud upon the court." Rule 60(b), Fed.R.Civ.P. (emphasis added). To state the obvious, plaintiffs' alleged fraud on the court does not involve an attack on a prior judgment or order.

To the extent *Hampton* authorizes an independent action for damages on the basis of the defendants' failure to disclose previous activities with the debtor as a fraud on the court, the decision conflicts with another court's decision in this circuit, *Federal Deposit Insurance Corporation v. S. Prawer & Co.,* 829 F.Supp. 439, 444–445 (D.Me.1993). The court in *Prawer* dismissed the count in the counterclaim for fraud on the court because such a claim "may and should be raised by motion." *Federal Deposit Insurance Corporation v. Prawer,* 829 F.Supp. at 445. *Prawer,* which involves a motion to dismiss a counterclaim for fraud on the court, is more on point to the case at bar than *Hampton* which, as previously noted, relies on Rule 60(b)'s savings clause which applies to attacks on judgments and orders. Indeed, the CMCC defendants agree to pursue the matter by motion if the court determines that it should be raised in that form. (Docket Entry # 30, p. 12).

The fact that a motion is the proper means to raise the argument, however, does not detract from the merits of the CMCC defendants' contentions. "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corporation,* 892 F.2d at 1118. The facts set forth in the counterclaim, if true, fall within the range of conduct which, in this circuit, may amount to a fraud on the court. *See, e.g., Aoude v. Mobil Oil Corporation,* 892 F.2d at 1118 (attaching fabricated purchase agreement to complaint and thereby representing it as authentic to gain unfair advantage against opposing party amounted to a

---

**25.** On appeal in *Pope,* the Eighth Circuit affirmed the decision in part, vacated the Rule 11 monetary award and remanded the case for further proceedings to consider a subsequent development in a decision relied upon by the district court. *Pope v. Federal Express Corporation,* 974 F.2d 982 (8th Cir.1992).

"near-classic example" of fraud on court); *see generally McDowell v. Seaboard Farms of Athens, Inc.*, 1996 WL 684140 at * 2 (M.D.Fla. Nov.4, 1996) (where "party fabricates evidence purporting to substantiate its claims, federal case law is well established that dismissal is appropriate").

While the facts alleged in the counterclaim are less egregious than those at issue in *Aoude*, the misconduct in *Aoude* was not the outer boundary of a fraud on the court. Rather, the First Circuit in *Aoude* cited a litany of fraud on the court cases, the majority of which involved conduct that was "less reprehensible than in the case at bar." *Aoude v. Mobil Oil Corporation*, 892 F.2d at 1120.

The contentions in the counterclaim show that plaintiffs filed the CDA with the court and alleged that Folkman breached that document and that CMCC ratified that document. In attaching the document to the complaint, plaintiffs redacted Dippel's markings thereby concealing CMCC's objections to the "contract" which belied its ratification.

Plaintiffs also did not inform the court that they received the CDA in or around June 1998 during confidential discussions to resolve the inventorship dispute as opposed to in 1995 in the ordinary course after Folkman signed the CDA. Notwithstanding the apparent lack of delivery of the CDA in the ordinary course which Illinois law requires, *see Glabman v. Bouhall*, 36 Ill.Dec. 852, 401 N.E.2d at 993,[26] plaintiffs filed a breach of contract claim against Folkman based on the express terms of the CDA as opposed to an implied at law or in fact breach of contract claim.[27] Plaintiffs' after the fact attempt to recharacterize their allegation against Folkman as an estoppel or implied breach of contract claim does not rewrite the complaint or otherwise cure the misconduct. Nor does a subsequent amendment. *See Aoude v. Mobil Oil Corporation*, 892 F.2d at 1120; *Derzack v. County of Allegheny, Pennsylvania*, 173 F.R.D. at 415.

In addition, the allegations in the complaint amount to serious issues of importance to the public. *See Hazel–Atlas Glass Company v. Hartford–Empire Company*, 322 U.S. at 246, 64 S.Ct. 997 (noting that patent issues were "of great moment to the public"). Furthermore, plaintiffs unnecessarily distributed[28] the complaint with the redacted "contract," under which Folkman purported to cede his right to the Kringle 5 invention, to the press and the allegations foreseeably garnered national attention thereby damaging Folkman's reputation.

Irrespective of the CMCC defendants' additional basis for their fraud on the court claim,[29] they are, at a minimum, enti-

---

**26.** The CDA has a choice of law provision dictating the application of Illinois law to the CDA while excluding application of Illinois choice of law rules. The relevant provision reads as follows:

18. *Governing Law.* This agreement shall be governed by and construed in accordance with the law of the State of Illinois excluding its conflict of laws principles.
(AC, Ex. B).

**27.** In no uncertain terms, the breach of contract claim in the complaint and in the amended complaint alleges that, "The CDA is a binding and enforceable agreement," and,

one sentence later, that, "Folkman signed the CDA agreement."

**28.** The reasonable inference from this allegation is that Abbott distributed the complaint to the press on its own accord independently of any request from a member of the press for a copy of the complaint.

**29.** The CMCC defendants submit that the complaint falsely alleged that CMCC "stood silent" for at least six months and never disavowed the CDA before receiving Kringle 5 (Docket Entry # 1, ¶¶ 35–36) when, in fact, Dippel's facsimile transmission to Davidson

tled to engage in discovery to explore the merits of their fraud on the court allegations. In the event discovery supports a fraud on the court argument, CMCC may raise the issue by motion.[30]

### 3. Breach of Contract

In seeking to dismiss the breach of contract count in the counterclaim,[31] plaintiffs assert that the CMCC defendants fail to allege the two essential elements of Abbott's breach and the CMCC defendants' damages of either the 1997 or the 1998 CDA. Plaintiffs also argue that the CMCC defendants lack standing because they are not third party beneficiaries of the 1998 CDA between Entremed and Abbott.

The standard applicable to a motion to dismiss bears repeating as well as further elaboration. "The pleading rules do not require a claimant to set out in detail the facts upon which he bases his claim." *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 72 (1st Cir.2000) (internal quotation marks omitted). Rather, all that is required is " 'a short and plain statement' of the claim showing that the pleader is entitled to relief." *DM Research, Inc. v. College of American Pathologists,* 170 F.3d 53, 55 (1st Cir.1999). As long as the facts in the pleading "give[ ] the defendant sufficient notice to file a responsive pleading," a generalized statement of facts is adequate.[32] *Langadinos v. American Airlines, Inc.*, 199 F.3d at 72–73; *accord Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (Rule 8 statement "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" '). Accordingly, it is not necessary to include evidentiary detail. *DM Research, Inc. v. College of American Pathologists*, 170 F.3d at 55.

These requirements, which the First Circuit describes as "minimal," are nevertheless not "nonexistent." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir.

---

(Docket Entry # 175, Ex. B) rejected the CDA in July 5, 1995, well before Cao received Davidson's novel Kringle 5 in October 1995 (Docket Entry # 175, ¶ 36).

**30.** Contrary to plaintiffs' argument (Docket Entry # 63), sanctions are not warranted for the CMCC defendants' brevis statement that exhibit B "never existed."

**31.** The breach of contract count is based on Abbott's breach of the 1997 and 1998 CDAs through its disclosure and use of, *inter alia,* the CDA and Folkman's laboratory notes in the complaint. The counterclaim describes both the CDA and Folkman's laboratory notes as "confidential information" (Docket Entry # 175, ¶ 73) and that Abbott breached the 1997 or 1998 CDA by using the laboratory notes and the CDA to support its claims (Docket Entry # 175, ¶¶ 99–101). Both the 1997 and 1998 CDAs prohibited the receiving party from disclosing or seeking to admit confidential information in a subsequent legal proceeding. (Docket Entry # 175, Ex. F & G).

As to the laboratory notes, the complaint alleges that "defendants" stole Davidson's Kringle 5 invention and that Folkman's laboratory meeting minutes dated December 1, 1995, state that "defendants had 'agreed' that they 'overlooked' Kringle 5." (Docket Entry # 1, ¶ 43 & caption). The amended complaint includes a similar allegation relative to Folkman's laboratory meeting minutes. (AC, ¶ 48).

As to the CDA, Abbott acquired the CDA in or around June 1998 during the parties' discussions about the inventorship dispute. (Docket Entry # 175, ¶ 89). Abbott then redacted Dippel's markings and attached the redacted CDA as an exhibit to the complaint to support its breach of contract claim. (Docket Entry # 175, ¶¶ 91, 99 & 101).

**32.** Indeed, the forms appended to the rules, which are themselves " 'sufficient' " and also " 'indicate the simplicity and brevity of statement which the rules contemplate,' " *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 998 n. 4, 152 L.Ed.2d 1 (2002), typically encompass a few, brief paragraphs.

1999). The complaint must set forth factual allegations, direct or circumstantial, "respecting each material element necessary to sustain recovery under some actionable legal theory." *Cooperman v. Individual, Inc.,* 171 F.3d at 47. "[B]ald assertions" as well as "subjective characterizations" need not be accepted and "[c]onclusory allegations," standing alone, "are a danger sign that the plaintiff is engaged in a fishing expedition." *DM Research, Inc. v. College of American Pathologists,* 170 F.3d at 55.

■ In order to establish a breach of contract claim under Illinois law, the plaintiffs, in this instance the CMCC defendants, must establish: (1) the existence of a valid contract; (2) the plaintiffs' performance of their obligations under the contract; (3) the defendant's breach; and (4) damages as a result of the breach. *CGE Ford Heights v. Miller,* 306 Ill.App.3d 431, 239 Ill.Dec. 477, 714 N.E.2d 35, 41 (1999); *Talbert v. Home Savings of America,* 265 Ill.App.3d 376, 202 Ill.Dec. 708, 638 N.E.2d 354, 357 (1994); *Berry v. Oak Park Hospital,* 256 Ill.App.3d 11, 195 Ill.Dec. 695, 628 N.E.2d 1159, 1165 (1993). With respect to the absence of factual support for the third element, plaintiffs point to the lack of a stamp on the CDA designating the document as "confidential."

■ First and foremost, the breach of contract count does not rely exclusively on Abbott's disclosure and use of the CDA. Rather, Abbott's use and quotation of Folkman's laboratory minutes also form the basis for the count. The counterclaim does not attach a copy of these minutes. As set forth in the counterclaim, these notes fall within the definition of "confidential information" contained in the 1997 or 1998 CDA. (Docket Entry # 175, ¶ 73).

The counterclaim also states that CMCC exchanged "confidential information" with Abbott during their discussions regarding the inventorship dispute. (Docket Entry # 175, ¶ 95). Finally, in no uncertain terms, the counterclaim identifies the breach as Abbott's use of the information "to support its claims in this litigation." (Docket Entry # 175, ¶ 99).

Not only does the counterclaim clarify the breach, it also alleges that the CMCC defendants "have been damaged as a result of Abbott's misuse of confidential documents and information exchanged pursuant to the confidentiality agreement." (Docket Entry # 175, ¶ 103). This statement, while brief, does not stand alone. *See generally In Re Compact Disc Minimum Advertised Price,* 138 F.Supp.2d 25, 28 (D.Me.2001). Rather, Abbott has notice that the damage resulted from its use in the complaint of the laboratory notes and the CDA. This factual predicate for the description of damages cures any deficiency when viewing the allegation in isolation and adequately enables Abbott to frame a responsive pleading. Dismissal of the breach of contract claim due to the failure to set forth a breach vis-a-vis Folkman's laboratory notes and the alleged failure to set forth the material element of damages is unwarranted.

The viability of the breach of contract claim based on the CDA is slightly more problematic. In order to survive the motion to dismiss, the counterclaim must set forth facts respecting the material element of Abbott's breach "necessary to sustain recovery under some actionable legal theory." *Cooperman v. Individual, Inc.,* 171 F.3d at 47. The CDA attached to the counterclaim is not stamped or marked "confidential." [33] The 1998 CDA defines

**33.** Plaintiffs correctly posit that, " '[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.' " *Clorox*

"confidential information" as information disclosed under the agreement "and marked 'Confidential.'" Significantly, Illinois law interprets similar contract language as requiring a stamp or mark of "confidential" on written disclosures. *See Nilssen v. Motorola, Inc.*, 963 F.Supp. 664, 668, 681–682 & n. 18–19 (finding similar definition unambiguous and that the definition requires written information to be marked or stamped "confidential").

▪ The CMCC defendants nevertheless argue that the parties' subsequent course of conduct modified the contractual provision requiring that confidential information be marked or stamped "confidential." The facts in the complaint support such modification. The counterclaim notes that both Abbott and CMCC exchanged confidential information under the terms of the 1997 and 1998 CDAs. (Docket Entry # 175, ¶¶ 72–74). CMCC's exchange of "confidential information" included the CDA which is not stamped "confidential." (Docket Entry # 175, ¶ 73 & Ex. A). The assertion that the CDA is confidential information (Docket Entry # 175, ¶ 73) does not necessarily contradict the absence of a "confidential" stamp on the CDA attached to the counterclaim. Rather, the counterclaim implies that the parties exchanged documents without the stamped marking, as shown by the absence of a stamp on the CDA. Such facts support recovery under the actionable theory that the parties modified the 1998 CDA by mutually accepting and exchanging documents without stamped markings and treating such documents as confidential and subject to the 1998 CDA.

▪ Under Illinois law, "'A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct.'" *Household Financial Services, Inc. v. Coastal Mortgage Services, Inc.*, 152 F.Supp.2d 1015, 1022 (N.D.Ill.2001) (quoting *International Business Lists v. American Telephone and Telegraph Company*, 147 F.3d 636, 641 (7th Cir.1998), citing *Maher & Associates, Inc. v. Quality Cabinets*, 267 Ill.App.3d 69, 203 Ill.Dec. 850, 640 N.E.2d 1000, 1007 (1994)). Under the facts and reasonable inferences of the counterclaim, the parties' course of conduct waived or modified any requirement in the CDA to stamp the exchanged document "confidential." [34] Furthermore, oral modification of a written agreement is possible even where, as here, "the contract precludes oral modifications." *Household Financial Services, Inc. v. Coastal Mortgage Services, Inc.*, 152 F.Supp.2d at 1022; *accord United States v. Wil–Freds Construction, Inc.*, 1997 WL 11041 at * 3 (N.D.Ill. Jan.7, 1997) ("written contract may be modified by a subsequent oral agreement even when the contract precludes oral modifications"). Nor, in light of the facts in *Household Financial* and its parenthetical quotation of the language in *Maher* of modifying a contract by "'acts or conduct,'" does this court read Illinois law as limiting modifications to oral agreements. In sum, the breach of contract claim adequately pleads the essential

*Company Puerto Rico v. Proctor & Gamble*, 228 F.3d 24, 32 (1st Cir.2000) (quoting Seventh Circuit case).

**34.** For present purposes, it is not necessary to resolve or definitively determine whether the contract language required exchanged information to be stamped "confidential." Although the *Nilssen* decision points to such a conclusion, this court leaves the issue for the court to determine at a later date. For present purposes, this court assumes *arguendo* that the 1998 CDA requires this construction but concludes that the parties' subsequent course of conduct under the facts and reasonable inferences of the counterclaim waived or modified this requirement.

elements of breach and damages both as to Folkman's laboratory notes and the CDA.

Plaintiffs also submit that the CMCC defendants are not third party beneficiaries of the 1998 CDA.[35] As to Folkman, Cao and O'Reilly, this court agrees. The counterclaim's statement that Folkman, Cao and O'Reilly are third party beneficiaries (Docket Entry # 175, ¶ 96) amounts to a legal conclusion not entitled to weight in resolving the motion to dismiss. The 1998 CDA does not expressly refer to Folkman, Cao or O'Reilly.

"In Illinois, an individual not a party to a contract may only enforce the contract's rights when that contract's original parties intentionally enter into the contract for the direct benefit of the individual." *Cahill v. Eastern Benefit Systems, Inc.*, 236 Ill.App.3d 517, 177 Ill.Dec. 718, 603 N.E.2d 788, 791 (1992). Although the language of the contract need not expressly designate the third party as a third party beneficiary, *see, e.g., People ex rel. Resnik v. Curtis & Davis, Architects and Planners, Inc.*, 78 Ill.2d 381, 36 Ill.Dec. 338, 400 N.E.2d 918, 919 (1980), "the promisor's intention must be shown by an express provision in the contract identifying the third party beneficiary." *Cahill v. Eastern Benefit Systems, Inc.*, 177 Ill.Dec. 718, 603 N.E.2d at 791–792; *see Arlington Financial Corporation v. Ben Franklin Bank of Illinois*, 1999 WL 89567 at * 5 (N.D.Ill. Feb.16, 1999) ("intent of the origi-

nal parties to directly benefit the third party must be shown by an express provision specifically identifying the third party beneficiary").[36] Abbott's liability " 'can not be extended or enlarged on the ground, *alone,* that the situation and circumstances of the parties justify or demand further or other liability.' " *People ex rel. Resnik v. Curtis & Davis, Architects and Planners, Inc.*, 36 Ill.Dec. 338, 400 N.E.2d at 919 (emphasis added). Moreover, "There is a strong presumption that a non-party to a contract cannot enforce the contract." *Arlington Financial Corporation v. Ben Franklin Bank of Illinois*, 1999 WL 89567 at * 5 (N.D.Ill. Feb.16, 1999). The 1998 CDA's failure to name Folkman, Cao or O'Reilly is fatal to their ability to recover on that contract.

Turning to CMCC's ability to recover on the 1998 CDA, its position is extremely weak given the brevity of the language in the 1998 CDA identifying CMCC. The express purpose of the agreement, however, is to exchange documents in confidence to determine the "Inventorship of [Kringle 5]." (Docket Entry # 175, Ex. G). The 1998 CDA identifies CMCC as the assignee of the patent application directed to fragments of the Kringle 5 region of human plasminogen and Entremed as only the licensee. Such language demonstrates that the contemplated exchange of documents would primarily involve confidential documents originating from CMCC as op-

---

**35.** Plaintiffs limit their third party beneficiary argument to the inability of "CMCC," defined as the CMCC defendants in plaintiffs' papers, to bring a breach of contract claim based on the Abbott/Entremed agreement, i.e., the 1998 CDA. This court expresses no opinion on the ability of Folkman, Cao and O'Reilly to recover under the 1997 CDA.

**36.** To the extent *Lynch v. Marklin of America, Inc.*, 724 F.Supp. 595, 598 (N.D.Ill.1989), concludes that language manifesting an intent to confer a direct benefit is not required when

the surrounding circumstances "clearly demonstrate that the contracting parties intended directly to benefit [the third party,]" the *Lynch* decision pre-dates the 1992 *Cahill* and the 1999 *Arlington* decisions. These decisions clarify that Illinois law requires the agreement to at least identify the third party beneficiary by name or class description. *See Garcia v. Lovellette*, 265 Ill.App.3d 724, 203 Ill. Dec. 376, 639 N.E.2d 935, 940 (1994) (contract may define the party benefitted by class description.)

posed to Entremed. CMCC therefore stood to directly benefit from the protection afforded by the 1998 CDA to its confidential information. Solely for purposes of the motion to dismiss, this court finds the language sufficient to support a finding that Abbott and Entremed intended to enter into the 1998 CDA for the direct benefit of CMCC.[37] The counterclaim gives plaintiffs sufficient notice to file a responsive pleading. It is the province of discovery and summary judgment motions to further elucidate the merits of CMCC's breach of contract claim vis-a-vis the 1998 CDA. *Swierkiewicz v. Sorema,* 122 S.Ct. at 998 (recognizing that "simplified notice pleading relies on liberal discovery rules and summary judgment motions ... to dispose of unmeritorious claims"). CMCC's breach of contract claim is therefore not subject to dismissal at this stage in the proceedings.

### 4. *Chapter 93A*

▆ Plaintiffs next submit that the CMCC defendants fail to state a claim under section 11 of chapter 93A. Plaintiffs assert that the failure of the defamation and breach of contract counts to survive dismissal warrants the dismissal of the chapter 93A count. Due to the viability of the defamation count and the breach of contract count brought by CMCC, plaintiffs' argument lacks merit.

In addition, the alleged facts, if true, fall comfortably within the reach of liability under section 11. During confidential discussions to resolve the inventorship dispute, Abbott threatened to publicly embarrass Folkman and his colleagues and to file suit if Abbott's demands to name Davidson as an inventor of the '221 patent were not met. Davidson, however, was not the inventor of Kringle 5 and thus had no right to be named as such on the '221 patent. (Docket Entry # 175, ¶¶ 60–64). Having fraudulently concealed the true inventor of the '221 patent to the PTO, Abbott then attempted to use this claim to force the CMCC defendants, by threats of public embarrassment and damage to their reputations, to name Davidson as an inventor on the '221 patent. When the discussions proved unsatisfactory, Abbott then used confidential documents obtained under the 1997 or 1998 CDA in the complaint. Moreover, plaintiffs concealed the true nature of the CDA to the public and to this court by altering and redacting Dippel's comments. Abbott then disseminated the complaint to the press containing the altered and misleading document which formed the basis for plaintiffs' contention that Abbott owned the Kringle 5 invention.

Such conduct goes beyond a mere litigation mistake in assessing the viability and reasonableness of the breach of contract claim based on the express terms of the CDA. Rather, it possesses the element of unfairness and deception inherent to a chapter 93A claim. *See Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185, 197 (1986) (Datacomm's misrepresentation that it did not retain copy of competitor's circulation list and its commencement of action on oath

---

**37.** Accordingly, the law of the case does bar a contrary determination of the language of the contract by the trial judge. On summary judgment, plaintiffs are free to argue to the court that the language is unambiguous and does not as a matter of law confer third party beneficiary status on CMCC. Inasmuch as this court does not resort to extrinsic evidence to reach this conclusion, it is not necessary to resolve the issue of the integration clause's import with respect to the third party beneficiary argument. *See generally Air Safety, Inc. v. Teachers Realty Corporation,* 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884–886 (1999) (discussing four corners rules albeit not in context of third party beneficiary claim).

with misstated fact and its use of litigation as "marketing tool" amounted to knowing violation of section 11); *see also Kattar v. Demoulas,* 433 Mass. 1, 739 N.E.2d 246, 257 (2000) ("conduct occasioning foreclosure as retribution for Kattar's refusal to testify qualifies as actionable conduct under § 11"); *Commercial Union Insurance v. Seven Provinces Insurance Company,* 217 F.3d 33, 43 (1st Cir.2000) (conduct of raising multiple defenses, "stringing Commercial Union along, with the intent (as its own witnesses admitted) of pressuring Commercial Union to compromise its claim" had "extortionate quality that marks a 93A violation"), *cert. denied,* 531 U.S. 1146, 121 S.Ct. 1084, 148 L.Ed.2d 959 (2001).

### 5. *Inequitable Conduct*

Plaintiffs move to dismiss Count V (inequitable conduct) of the counterclaim under Rule 12(b)(6) or, in the alternative, to strike the count under Rule 12(f), Fed. R.Civ.P. ("Rule 12(f)"), for failure to comply with Rule 9(b), Fed.R.Civ.P. ("Rule 9(b)"). The CMCC defendants submit that the counterclaim complies with Rule 9(b). This court agrees.

Although the Federal Circuit has not directly addressed the applicability of Rule 9(b) to inequitable conduct claims, the majority of courts reaching the issue require such claims to satisfy Rule 9(b)'s particularity requirement. *See Systemation, Inc. v. Engel Industries, Inc.,* 183 F.R.D. 49, 51 (D.Mass.1998) (collecting cases holding Rule 9(b) applicable to inequitable conduct claims); *Samsung Electronics Company, Limited v. Texas Instruments, Inc.,* 1996 WL 343330 at * 2 n. 3 (N.D.Tx.1996) (same). Two justifications militate in favor of applying Rule 9(b) to an inequitable conduct claim.

First, there is the Federal Circuit's expressed concern about the "habit of charging inequitable conduct in almost every major patent case." *Burlington Industries, Inc. v. Dayco Corporation,* 849 F.2d 1418, 1422 (Fed.Cir.1988) (describing the habit as "an absolute plague"). Stricter pleading requirements "might act as a check on such abuses." *Systemation, Inc. v. Engel Industries, Inc.,* 183 F.R.D. at 51.

Second, Rule 9(b) expressly governs fraud claims and an inequitable conduct claim is markedly similar to a fraud claim. *Systemation, Inc. v. Engel Industries, Inc.,* 183 F.R.D. at 51 (describing inequitable conduct claim as "a form of fraud"). Succinctly stated, "Inequitable conduct requires that the patentee withheld material information from the patent examiner or submitted false material information, with the intent to deceive or mislead the examiner into granting the patent." *Upjohn Company v. Mova Pharmaceutical Corporation,* 225 F.3d 1306, 1312 (Fed.Cir.2000).

 Following the lead of the majority view, this court similarly concludes that Rule 9(b) applies to the inequitable conduct count in the counterclaim. In matters of procedure not unique to patent law, the Federal Circuit applies the law of the forum's circuit court of appeals. *Systemation, Inc. v. Engel Industries, Inc.,* 183 F.R.D. at 51 n. 1 (citing *Panduit Corporation v. All States Plastic Manufacturing, Inc.,* 744 F.2d 1564, 1574–1575 (Fed.Cir. 1984)).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, *intent* [and] knowledge ... may be averred generally." [38] Fed.R.Civ.P. 9(b) (emphasis

---

**38.** Rule 9(b) allows the accused party "to prepare meaningful defenses," prevents "conclusory allegations of fraud from serving as a basis for strike suits" and protects the ac-

added). The First Circuit interprets "Rule 9(b) to require 'specification of the time, place, and content of an alleged false representation.'" *Johnson v. Brown & Williamson Tobacco Corporation*, 122 F.Supp.2d 194, 207 (D.Mass.2000); *see also Systemation, Inc. v. Engel Industries, Inc.*, 183 F.R.D. at 51 (recognizing that First Circuit strictly applies Rule 9(b)). The CMCC defendants must therefore "state the time, place and content of the alleged inequitable conduct." *Systemation, Inc. v. Engel Industries, Inc.*, 183 F.R.D. at 51.

■ Paragraph 113 of the counterclaim identifies the content of the inequitable conduct claim. It is based on Abbott's false representation to the PTO that Davidson was the sole inventor of the inventions claimed in the '146 and '484 patents;[39] Abbott's failure to disclose that Folkman, O'Reilly and Cao were the true inventors of these inventions; and Abbott's failure to disclose its inventorship dispute with Children's Hospital. (Docket Entry # 175, ¶ 113). The counterclaim fully details the communications between Cao and Davidson as well as Cao's disclosures in August, September and October of 1995 of experimental results and research protocols for testing the anti-angiogenic effect of plasminogen fragments such as Kringle 5. (Docket Entry # 175, ¶¶ 37 & 40–41). Using the information and ideas of Cao, including the idea of investigating the anti-angiogenic effect of plasminogen fragments, Abbott filed the patent application which led to the '146 patent in May 1996. (Docket Entry # 175, ¶¶ 59–60).

Such allegations more than sufficiently outline the misrepresentation and omissions at issue. Plaintiffs' reliance on *Poly–America, Inc. v. GSE Lining Technology, Inc.*, 1998 WL 355477 at * 5 (N.D.Tex. June 29, 1998), is misplaced. The allegation of inequitable conduct regarding the inventorship dispute in *Poly–America* was far more general than the allegations in the case at bar.[40] The court in *Poly–America* considered deficient the plaintiff's failure to identify the previous inventors, to provide a time period and to specify the country in Europe wherein the inspection at issue took place. In contrast, the CMCC defendants' counterclaim identifies the inventors (Folkman, Cao and O'Reilly) and details the circumstances surrounding the invention.

The counterclaim also specifies that the misrepresentation and omissions occurred during the prosecution of the May 1996 application that led to the '146 patent and the April 1997 application that led to the '484 patent. (Docket Entry # 175, ¶¶ 59–64 & 113). Indeed, the counterclaim provides the example that in January 1999 the patent examiner challenged Abbott that the claims in the April 1997 application were anticipated by the '221 patent. In response, Davidson asserted that he

cused party "from groundless charges that may damage their reputations." *United States v. Parke–Davis*, 147 F.Supp.2d 39, 46(D.Mass.2001); *see New England Data Services, Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987).

**39.** As previously described, these patents dealt with the anti-angiogenic properties of Kringle 5.

**40.** The relevant allegation of inequitable conduct in *Poly–America* is as follows:

intentionally and deliberately misleading the Patent Office by swearing that the inventors were the original inventors of the invention claimed in the '272 Patent when the invention was actually conceived by one or more of the inventors after inspecting liners with reflective and non-reflective sides in Europe or documentation disclosing such liners.

*Poly–America, Inc. v. GSE Lining Technology, Inc.*, 1998 WL 355477 at * 5 (N.D.Tx. June 29, 1998) (internal quotation marks omitted).

reduced his invention to practice before the December 13, 1995 application date of the '221 patent without disclosing "that he derived his knowledge from Children's Hospital." (Docket Entry # 175, ¶¶ 65–66). The counterclaim therefore complies with Rule 9(b)'s requirements to specify the time and place of the inequitable conduct. *See, e.g., Poly–America, Inc. v. GSE Lining Technology, Inc.,* 1998 WL 355477 at * 3 (N.D.Tx. June 29, 1998) (allegation that inequitable conduct occurred "during prosecution of the '272 Patent before the PTO" satisfied time and place requirements of Rule 9(b)).

Assuming *arguendo* that Rule 9(b) also requires the counterclaim to identify the material element of intent, *see Simpson v. Stand 21, S.A.,* 1994 WL 735936 at * 2 (S.D.Ind. Sept.1, 1994) ("[u]nder Rule 9(b), the defendants must specifically plead . . . the requisite intent" with respect to inequitable conduct claim); *see also Samsung Electronics Company, Limited v. Texas Instruments, Inc.,* 1996 WL 343330 at * 3 (N.D.Tx.1996) (noting, in passing, that "some of the paragraphs do not allege the requisite intent necessary to sustain an inequitable conduct claim"), paragraph 66 of the counterclaim satisfies any such requirement. In essence, the counterclaim alleges that Davidson and, by implication Abbott, intentionally concealed from the PTO the information that Davidson acquired his knowledge for the inventions from Cao and others at Children's Hospital.

In sum, the counterclaim satisfies Rule 9(b) and adequately serves the purposes[41] behind Rule 9(b)'s particularity requirements. It provides plaintiffs with sufficient notice to prepare a meaningful response. It is sufficiently specific to demonstrate that the CMCC defendants are not filing frivolous allegations or sub-

mitting a groundless claim. Because the counterclaim complies with Rule 9(b), dismissal under Rule 12(b)(6) or striking the claim under Rule 12(f) is unwarranted.

### 6. *Abuse of Process*

Plaintiffs assert that the CMCC defendants' failure to set forth a cognizable ulterior purpose mandates dismissal of their abuse of process claim. This court disagrees.

■ The essential elements of an abuse of process claim are that: "(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185, 195 (1986). Plaintiffs submit that the second element is missing from the counterclaim. They argue that the CMCC defendants must allege that plaintiffs used the legal process to obtain a collateral advantage that is not properly part of the lawsuit. Because the CMCC defendants fail to allege any such collateral benefit outside of plaintiffs' attempt to secure inventorship and assignment rights to the Kringle 5 invention, the CMCC defendants fail to allege an ulterior purpose, according to plaintiffs.

■ An ulterior or illegitimate purpose "consists of using process 'to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.'" *Ferraro v. First Safety Fund National Bank,* 11 Mass.App.Ct. 928, 416 N.E.2d 225, 226 (1981) (citations omitted); *Jones v. Brockton Public Markets, Inc.,* 369 Mass. 387, 340 N.E.2d 484, 485 (1975) (same); *Cohen v. Hurley,* 20 Mass.App.Ct. 439, 480 N.E.2d 658, 660 (1985). Although the

---

41. See footnote number 38.

plaintiff need not establish that the defendant's suit is groundless, the plaintiff's knowledge that his claim is groundless may show that the plaintiff used the legal process for an ulterior purpose. *Fishman v. Brooks*, 396 Mass. 643, 487 N.E.2d 1377, 1383 (1986); *see, e.g., Lorusso v. Bloom*, 321 Mass. 9, 71 N.E.2d 218, 218 (1947) (commencement of supplementary process "action known to be groundless" to collect twice on debt already paid constitutes abuse of the legal process).

 Using the lawsuit to cause the other party to expend substantial sums to mount a defense, however, does not amount to an ulterior purpose. *See Broadway Management Services v. Cullinet Software*, 652 F.Supp. 1501, 1503 (D.Mass.1987) (interests of extracting financial benefit and causing substantial expenditure of money are naturally part of counts in complaint and consequently not illegitimate). The court in *Cohen* summarized the line between legitimately asserting a claim and illegitimately using the legal process for an improper purpose:

> mere commencement of litigation to enforce a claim which the person commencing the litigation knows or reasonably should have known to be groundless does not constitute abuse of process without proof of an ulterior purpose. Groundless Cohen's action may have been, but it was aimed, professedly and actually, at defeating the subdivision proposal, nothing more or different. There was no perversion of process to achieve an extraneous end. There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions; the case is otherwise where there is a form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as

the surrender of property or the payment of money, by the use of the process as a threat or club.

*Cohen v. Hurley*, 480 N.E.2d at 660 (citations and internal quotation marks omitted).

Examples of sufficient ulterior purposes clarify that the purpose must be extraneous or collateral to the proceeding itself. *See, e.g., American Velodur Metal, Inc. v. Schinabeck*, 20 Mass.App.Ct. 460, 481 N.E.2d 209, 215 (1985) (sufficient facts for the jury to infer ulterior purpose that the husband/plaintiff filed complaint against the defendant/wife for ulterior purpose of coercing more favorable settlement in separate action for divorce); *Carroll v. Gillespie*, 14 Mass.App.Ct. 12, 436 N.E.2d 431, 439 (1982) (knowingly initiating groundless criminal complaints to collect a civil debt constitutes illegitimate purpose); *Stromberg v. Costello*, 456 F.Supp. 848, 849–850 (D.Mass.1978) (applying for criminal complaint, maliciously and without probable cause, to coerce the plaintiff to withdraw civil action constitutes ulterior purpose); *cf. Cohen v. Hurley*, 480 N.E.2d at 661 (bringing groundless allegations to challenge proposed subdivision of land is not illegitimate purpose when lawsuit was aimed at defeating the subdivision proposals).

 The counterclaim alleges that in the course of the discussions to resolve the inventorship dispute, Abbott threatened to publically embarrass and humiliate Folkman and his colleagues if the CMCC defendants did not meet Abbott's demands to name Davidson as an inventor on the '221 patent and assign all rights to the invention to Abbott. (Docket Entry # 175, ¶¶ 69 & 74). Abbott then filed a false complaint based on the redacted CDA which purported to give Abbott joint or exclusive property rights to the Kringle 5 invention. (Docket Entry # 175, ¶¶ 75, 76,

88 & 91). Abbott also unnecessarily distributed the complaint to the press knowing that it contained the redacted CDA and the accompanying false claim of Folkman's express breach of the redacted CDA. The dissemination of the defamatory statements in the complaint, including that the CDA was a binding agreement that gave Abbott rights to the Kringle 5 invention (Docket Entry # 1, ¶¶ 29, 70 & 73(d)), naturally damaged the good name and reputations of Folkman, Cao, O'Reilly and Children's Hospital in the relevant communities. (Docket Entry # 175, ¶¶ 78–80). Finally, and significantly, Abbott did not file the lawsuit simply to acquire the rights to the Kringle 5 invention. Rather, it filed the lawsuit with the intent "to publically embarrass and humiliate the individual scientists and Children's Hospital." (Docket Entry # 175, ¶ 81).

Although the issue is close, *see Broadway Management Services v. Cullinet Software*, 652 F.Supp. at 1503 (ulterior motives insufficient inasmuch as they "are naturally tied up with the interests properly part of the counts in BMS's complaint"), the First Circuit "recognize[s] that the desire to injure a business or business reputation is an improper ulterior motive sufficient to state a claim for abuse of process." *General Electric Company v. Lyon*, 894 F.Supp. 544, 552 (D.Mass.1995) (denying Rule 12(b)(6) motion to dismiss abuse of process claim). Moreover, the desire to damage the reputations is collateral to the allegations in plaintiffs' complaint. The fact that the CMCC defen-

dants allege such damage in a defamation count in their counterclaim should not bar them from pleading an abuse of process count. Solely for purposes of resolving the motion to dismiss,[42] plaintiffs' threats to publicly embarrass Folkman and his colleagues and Abbott's motive of filing the lawsuit to damage the reputations and publicly humiliate the individual scientists and Children's Hospital constitute an ulterior purpose that is sufficiently collateral to maintain, at this stage, an abuse of process claim.

## II. *PLAINTIFFS' RULE 12(B)(6) MOTION TO DISMISS ENTREMED, INC.'S AMENDED COUNTERCLAIMS (DOCKET ENTRY # 181)*

In seeking to dismiss Entremed's breach of contract count in Entremed's counterclaim,[43] plaintiffs assert, as they did with the CMCC defendants, that Entremed fails to allege the two essential elements of Abbott's breach and Entremed's damages. The allegations in Entremed's counterclaim (Docket Entry # 174), taken as true, together with the terms of the 1998 CDA,[44] show the following.

In May 1998 Abbott and Entremed entered into the 1998 CDA. The 1998 CDA governed the exchange of confidential information between Abbott and Entremed during the course of their discussions to resolve the inventorship dispute regarding the Kringle 5 invention. Although summarized *supra*, in pertinent part, the 1998 CDA provided for the exchange of confidential information and prohibited the ad-

---

**42.** Accordingly, the law of the case doctrine does not bar plaintiffs from raising this issue in a subsequent filing such as in a motion for summary judgment.

**43.** The breach of contract count is based on Abbott's breach of the 1998 CDA between Abbott and Entremed.

**44.** Although Entremed did not attach the 1998 CDA to its counterclaim, the document is central to Entremed's breach of contract claim and neither party challenges this court's ability to consider the document without converting the motion to dismiss into a motion for summary judgment. *See Beddall v. State Street Bank and Trust Company*, 137 F.3d 12, 16–17 (1st Cir.1998).

mission by the receiving party of such confidential information in any subsequent legal proceeding. The document defined "Confidential Information" as "information disclosed hereunder in writing and marked 'Confidential,' or if information by a Disclosing Party is initially disclosed orally, visually and/or in another form, it shall be identified as confidential at the time of disclosure and summarized in writing marked 'Confidential' and provided to the Receiving Party within thirty (30) days of initial disclosure." (Docket Entry # 175, Ex. G).

Pursuant to the 1998 CDA, Entremed shared documents with Abbott including the CDA signed by Folkman containing the underlinings and markings by Dippel. Also pursuant to the 1998 CDA, Entremed shared a page of Folkman's laboratory notebook from on or about December 1, 1995, wherein Folkman states that, "[Cao] was the first to alert everyone at these two places [Abbott and Carnegie Mellon] by asking for all kringle fragments." (Docket Entry # 174, ¶ 47).

Similar to CMCC's counterclaim, Entremed's counterclaim alleges that Abbott breached the terms of the 1998 CDA by: (1) attaching the altered CDA to the complaint and representing the altered document as an agreement between Abbott, Folkman and CMCC; and (2) misleadingly quoting an entry in Folkman's laboratory notebook dated on or about December 1, 1995, in the complaint. As a result of these two breaches, Entremed suffered "actual damages." (Docket Entry # 174, ¶ 49(c)).

In moving to dismiss the breach of contract claim, Abbott argues that Entremed never alleges that it marked the disclosed documents "confidential" and that the

CDA attached to the CMCC defendants' counterclaim is not marked or otherwise stamped "confidential." Accordingly, Entremed purportedly fails to adequately plead a breach of the 1998 CDA by Abbott. For reasons already explained in part I(3) and briefly elucidated below, the argument is unavailing.

Turning to the alleged failure to set forth the material element of Abbott's breach, Folkman's laboratory notes are not attached to the counterclaim and the reasonable inference from the counterclaim is that they fall within the 1998 CDA's definition of confidential information. As to the allegation that Abbott breached the 1998 CDA by attaching the CDA to its complaint, the 1998 CDA describes the parties' desire to exchange documents relating to Kringle 5 and that each party will receive and evaluate the documents received from the other party under the terms of the agreement. The executed 1998 CDA therefore infers that the parties exchanged confidential information and documents relative to the Kringle 5 invention. The assertion that Entremed supplied the CDA pursuant to the 1998 CDA (Docket Entry # 174, ¶ 46) does not necessarily contradict the absence of a "confidential" stamp on the CDA attached to the counterclaim. Rather, Entremed's counterclaim implies that the parties exchanged documents without the stamped marking, as shown by the absence of a stamp on the CDA. Such facts support recovery under the actionable theory that the parties modified the 1998 CDA by mutually accepting and exchanging documents without stamped markings and treating such documents as confidential and subject to the 1998 CDA.[45]

 Abbott's second argument relative to the failure to plead damages is also

---

45. At the summary judgment hearing, Entremed's counsel adopted the arguments of the CMCC defendants' counsel including the

argument that the parties modified their agreement by their conduct and course of dealing.

unavailing. The allegation that Entremed suffered actual damages is sufficient. Although brief, the allegation does not stand alone. Rather, Abbott has notice that Entremed's damages resulted from its use in the complaint of the laboratory notes and the CDA. This factual predicate for the description of damages cures any deficiency when viewing the allegation in isolation and adequately enables Abbott to frame a responsive pleading. Moreover, Illinois law allows the victim of a breach of contract to recover nominal damages. *See Stromberger v. 3M Company*, 990 F.2d 974, 976 (7th Cir.1993) (dicta noting that, "victim of a breach of contract is entitled to nominal damages even if he is not injured by the breach"). Entremed's allegation of "actual damage" therefore provides a further description of the damages sought.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[46] that plaintiffs' motion to dismiss the CMCC defendants' counterclaim (Docket Entry # 180) be **DENIED** except to the extent that Count II for fraud on the court be **DISMISSED**[47] and Count III for breach of contract be **DISMISSED** as to the breach of contract claim under the 1998 CDA by Folkman, Cao and O'Reilly. This court further **RECOMMENDS**[48] that plaintiffs' motion to dismiss Entremed's

counterclaim (Docket Entry # 181) be **DENIED.**

**46.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. *United States v. Escoboza Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).

**47.** As discussed *supra*, the CMCC defendants may bring the claim by motion in the event discovery supports the allegations in the counterclaim.

**48.** See footnote nuber 46.